Department of Treasury
Internal Revenue Service
Philadelphia, PA 19255

Notice Date:
Notice Number: CP565A
ITIN:

For assistance call us at:
(215)516-4846

Or you may write us at:
P.O. Box 447
Bensalem, PA 19020

#### WE ASSIGNED YOU AN IRS INDIVIDUAL TAXPAYER IDENTIFICATION NUMBER(ITIN)

Thank you for your Form W-7, Application for IRS Individual Taxpayer Identification Number. We assigned you ITIN            . Please keep this notice for your records.

Your ITIN is not a Social Security Number (SSN). It is for income tax purposes only. Please use your ITIN when an SSN is requested on any U.S. Federal Income Tax Return. Use your ITIN on all correspondence with the IRS, including tax payments, refund claims, and any Form 8233 you give to your employer or payer. Form 8233 is used to claim an exemption from U.S. withholding tax. Using any variation in your name or ITIN may cause processing delays and incorrect information on your account.

If you become a U.S. resident or a U.S. citizen, you will probably be eligible to get an SSN. If so, you must then apply for an SSN from the Social Security Administration and start using that number for tax purposes instead of your ITIN. When you receive an SSN, please send a copy of your social security card, along with a copy of this notice to the address listed above, so that we can update our records.

If you have any questions, please call us at the number listed above.

This card is the property of the Internal Revenue Service (IRS). Use of this card signifies agreement to the current conditions set forth by the IRS.

This card is not valid unless signed by the person identified on the front.

If found mail to: IRS, ITIN Unit
P. O. Box 447
Bensalem, PA 19020

Contact the Philadelphia Service Center on (215) 516-4846 regarding this card.

 Department of the Treasury
Internal Revenue Service

IRS Individual Taxpayer Identification Number

This number has been established for

To be used for tax purposes only

_____
Signature

Department of the Treasury
Internal Revenue Service

Form 9844 (7-96)
Catalog No. 22337C

Westlaw.

GUAM CODE ANNOTATED
TITLE 11. FINANCE & TAXATION.
DIVISION 1. DEPARTMENT OF REVENUE AND TAXATION
CHAPTER 1. ADMINISTRATION
§ 1103. Purpose of Department.

The Department shall be responsible for the administration of this Chapter and the performance of the responsibilities and duties assigned by law. It shall be charged with the enforcement of the tax laws of Guam and the collection of revenue. It shall also be the government agency generally responsible for licensing and registration as well as allied and connected enforcement functions.

SOURCE: GC § 49272.

.1 G.C.A. § 1103, GU ST T. 11, § 1103

Current through P.L. 27-161 (2004)

Copr. © 2004. Government of Guam.

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



**Westlaw.**

GUAM CODE ANNOTATED
TITLE 11. FINANCE & TAXATION.
DIVISION 1. DEPARTMENT OF REVENUE AND TAXATION
CHAPTER 1. ADMINISTRATION

### § 1104. Functions.

(a) **Income Tax.** The Department shall be responsible under the Governor for the enforcement of the Guam Territorial Income Tax set out in § 1421 of Title 48, U.S.C.A.

(b) **General Taxes.** The Department shall be responsible for the administration and enforcement of Division 2 of this Title and the taxes levied therein.

(c) **Business License Law.** The Department shall be responsible for the administration and enforcement of the Business License Law set out in Division 3 (beginning with Chapter 70) of this Title.

(d) **Vehicle Registration.** The Department shall be responsible for all functions formerly assigned the Department of Finance under the Vehicle Code of Guam, Title 16 Guam Code Annotated.

(e) **Alcoholic Beverage Control.** The Department shall be responsible for all functions formerly assigned the Department of Finance under the Alcoholic Beverage Control Act, Chapter 3 of this Title.

(f) **Savings and Loan.** The Department shall be responsible for the administration and enforcement of the Savings and Loan Association Act, [Title 22 of this Code].

(g) **Insurance.** The Department shall be responsible for the administration and enforcement of the Insurance Law of Guam, [Title 22 of this Code].

(h) **Securities.** The Department shall be responsible for the administration and enforcement of the Uniform Securities Act[Title 22 of this Code].

(i) **Weights and Measures.** The Department shall be responsible for the administration and enforcement of weights and measures, Chapter 2 of this Title.

(j) **Corporations.** The Department shall be responsible for the administration and enforcement of the General Corporation Law, Part 1 of Title 18 of this Code. (k) **Narcotics.** [Repealed by Implication]

(m) **Tax Preparers.** The Department shall be responsible for the administration and enforcement of the Tax Preparers Act, 11 GCA Chapter 40, including but not limited to the adoption of rules and regulations under the provisions of the Administration Adjudication Act.

(n) **Passports.** The Department shall be responsible for providing Passport Acceptance Agents, provided that all funds collected, derived or received from the issuance of passports shall be deposited in the Fund created by § 1111 of this Title.

**SOURCE:** GC § 49273 as amended by P.L. 13-92. Subsection (n) added by P.L. 27- 05:III:3.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



GOVERNMENT
EXHIBIT

2

NOTES, REFERENCES, AND ANNOTATIONS

**Cross-References:** 9 GCA Chapter 67, Articles 3 and 5, provide a comprehensive scheme for the regulation of *controlled substances*, which include narcotic drugs. Enforcement powers are given to the Governor, who may delegate them to the appropriate agencies. Most regulatory functions are undertaken by the Department of Public Health & Social Services, which criminal enforcement is handled by the Guam Police Dept. and the Attorney General's Office.

**NOTE:** Former Gaming Commission Duties.

P.L. 19-5:118 transferred duties of the Greyhound Racing Commission (GC § 59001, et seq.) to the Director of Revenue & Taxation;

P.L. 19-5:119 transferred duties of the Guam Gaming Commission set forth in the Territorial Lottery Act, GC § 6230, et seq., to the Director of Revenue & Taxation;

P.L. 19-5:121 transferred records, property and employees from Guam Gaming Commission to the Department of Revenue & Taxation.

.1 G.C.A. § 1104, GU ST T. 11, § 1104

Current through P.L. 27-161 (2004)

Copr. © 2004. Government of Guam.

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

GUAM CODE ANNOTATED
TITLE 11. FINANCE & TAXATION.
DIVISION 1. DEPARTMENT OF REVENUE AND TAXATION
CHAPTER 1. ADMINISTRATION
### § 1106. Organization and Personnel.

(a) The Director may establish such divisions or other organizational units as he may determine to be necessary for the efficient and effective administration and operation of the Department. Each such division or organizational unit shall be subject to the supervision and direction of the Director and shall have jurisdiction of such matters, exercise such powers, and perform such duties as may be assigned to it by the Director or otherwise by applicable law.

(b) The Director may appoint and remove officers and other employees within the Department in accordance with the provisions of the Personnel Policy and the Civil Service Commission, 4 GCA Chapter 4.

(c) The Director may delegate authority for the performance of any of his powers or duties to any officer or employee under his direction and supervision.

**SOURCE:** GC § 49275.

.1 G.C.A. § 1106, GU ST T. 11, § 1106

Current through P.L. 27-161 (2004)

Copr. © 2004. Government of Guam.

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GOVERNMENT
EXHIBIT
3

Westlaw.

GUAM CODE ANNOTATED
TITLE 11. FINANCE & TAXATION.
DIVISION 1. DEPARTMENT OF REVENUE AND TAXATION
CHAPTER 1. ADMINISTRATION
§ 1107. General Powers and Duties of Director.

As head of the Department, the Director:

(a) Shall administer the Department;

(b) Shall exercise and discharge the powers and duties of the Department through such divisions or other organizational units as he may establish pursuant to this Title or as otherwise provided by law;

(c) Shall enforce the provisions of this Title and of any other laws imposing any power, duty or other function upon the Department;

(d) May formulate and adopt rules necessary or proper for the internal administration of the Department.

(e) Shall expend fifty percent (50%), pro rata, of the funds in the Tax Collection Enhancement Fund to employ Tax Technicians, Revenue Agents, Revenue Officers and for other related expenses in order to increase collection of taxes and for the salaries of employees serving as Passport Acceptance Agents, two of whom may be transferred into the Department. He shall deposit fifty percent (50%), pro rata, of the funds in the Tax Collection Enhancement Fund to the Public School Library Resources Fund created by 17 GCA § 4120.1.

SOURCE: GC § 49276. Subsection (e) added by P.L. 27-005:III:4.

.1 G.C.A. § 1107, GU ST T. 11, § 1107

Current through P.L. 27-161 (2004)

Copr. © 2004. Government of Guam.

END OF DOCUMENT

*www.guamcourts.org*
*GARR: Title 30 - Rev + Tax*
*∅ regs adopted concerning drivers license*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GOVERNMENT
EXHIBIT
4



GU ST T. 16, § 3101                                                                                          Page 1
16 G.C.A. § 3101

GUAM CODE ANNOTATED
TITLE 16. VEHICLES.
CHAPTER 3. GENERAL PROVISIONS
ARTICLE 1. DRIVERS LICENSES
§ 3101. License: Requirement.

(a) Unless expressly exempted under this Title, a person shall not drive a motor vehicle upon a highway without having in his immediate possession a valid operator's or chauffeur's license issued under this Title. An operator's license authorizes the licensee to drive as an operator only. A chauffeur's license authorizes the licensee to drive as an operator or as a chauffeur.

(b) A person employed by or in the service of the United States while operating a vehicle owned or controlled by the United States need not obtain an operator's or chauffeur's license.

(c) A person having in his immediate possession a valid operator's or chauffeur's license issued by any other territory, Commonwealth or state of the United States, Japan, the Republic of China (Taiwan), the Republic of Korea, the Republic of the Philippines, or Australia may drive a motor vehicle upon the highways for a period not exceeding thirty (30) days from the date such person arrived on Guam. However, upon the expiration of such thirty-(30-) day period, such person must (i) apply for a Guam driver's license, (ii) be required to take a written test, and if that person passes the written test, then a driver's license shall be issued; **provided**, however, if such person fails the written test twice, such person shall be required to complete a driver education seminar before being allowed to retake the test, which seminar must include at least eight (8) hours of classroom instruction and four (4) hours of in-car instruction. In addition, a person having in his immediate possession a temporary operator's or chauffeur's license issued under this Title may drive a motor vehicle upon the highways for a period not exceeding thirty (30) days, while the Guam Police Department is completing investigation and determination of all facts relative to the applicant's right to receive a license. Such temporary license is invalid when the applicant's license has been issued or refused.

(d) A person having in his immediate possession an instruction permit issued under this Title may drive a motor vehicle upon the high ways for a period not exceeding ninety (90) days when accompanied by, and under the immediate supervision of, a licensed operator or chauffeur.

The Director of Revenue and Taxation may further restrict a permit to any applicant as he may determine to be appropriate to assure the safe operation of a motor vehicle by the permittee.

(e) An applicant for a license or permit shall submit an application to the Department of Revenue and Taxation on a form prescribed by it, verified under oath and containing the following information:

(1) the applicant's full name, age, sex and both mailing and residence addresses;

(2) the height, weight and color of eyes of the applicant;

(3) the kind of license applied for;

(4) whether the applicant has been licensed previously as an operator or chauffeur, and if so, when and in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



what jurisdiction and whether or not any such license has been suspended or revoked, and if so, the date of and reason for such suspension or revocation;

(5) whether the applicant previously has been refused an operator's or chauffeur's license in Guam, and if so, the date and the reason for such refusal;

(6) whether the applicant has previously operated a motor vehicle, and if so, for what length of time;

(7) whether the applicant has the normal use of both hands and feet;

(8) whether the applicant has ever been afflicted with heart condition, epilepsy, paralysis, insanity or other disability or disease affecting his ability to exercise reasonable and ordinary control in operating a motor vehicle upon a highway;

(9) whether the applicant understands traffic signs and signals;

(10) one (1) parent or guardian of an applicant under the age of eighteen (18) shall attest to his relationship with the minor; certify the correctness of information furnished on the application form; give his consent to the issuance of a license to the applicant and shall sign the application;

(11) the applicant and licensing official shall sign all approved applications and date the application at the time signatures are made; and

(12) a valid Certificate of Completion of a drivers education course by the applicant, if the applicant is applying for a license for the first time or if the applicant is under eighteen (18) years of age, and any other information necessary to determine whether the applicant is entitled to a license under this Title.

An applicant for a chauffeur's license shall state the type of vehicle or combination of vehicles he desires to operate.

(f) The Department of Revenue and Taxation shall not issue any license or permit unless it determines that the applicant is lawfully qualified for a license or permit and approves the application.

(g) The examination shall include a test of the applicant's knowledge and understanding of the provisions of this Title governing the operation of vehicles upon the highway, his understanding of traffic signs and signals, and the applicant shall be required to give an actual demonstration of his ability to exercise ordinary and reasonable control in operating a motor vehicle by driving the same under the supervision of an examining officer. The examination shall also include a test of the hearing and eyesight of the applicant and such other matters as may be necessary to determine the applicant's mental and physical fitness to operate a motor vehicle upon the highways and whether any ground exists for refusal of a license or permit under this Title. Every applicant for a chauffeur's license shall be required to submit to an examination appropriate to the type of vehicle or combination of vehicles he desires a license to drive.

(h) An applicant is not entitled to an operator's or chauffeur's license or instruction permit:

(1) Who is not of legal age to receive such license or permit. An applicant for a new operator's license or instruction permit must (i) have a valid Certificate of Completion of a drivers education course and (ii) be at least eighteen (18) years of age, whether applying for a new license or for renewal of an existing license, or if

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

under eighteen (18) must be at least sixteen (16) years of age and have the consent in writing of his parents or guardians to drive a motor vehicle. An applicant for a chauffeur's license must be at least eighteen (18) years of age and if the application is for a new license and not a renewal, must have a valid Certificate of Comple- tion.

(2) Who is a habitual drunkard or addicted to the use of narcotic drugs or a habitual user of any other drug rendering such person incapable of safely operating a motor vehicle.

(3) Who is insane or feeble minded or an idiot, imbecile or epileptic.

(4) Who is unable as shown by examination to understand traffic signs or signals or who does not have a reasonable knowledge of the provisions of this Title governing the operation of vehicles upon the highways.

(5) When it appears by examination or other evidence that such person is unable to safely operate a motor vehicle upon a highway because of physical or mental defect or except in the case of an applicant for an in- struction permit, lack of skill. Any physical or mental defect of the applicant which in the opinion of the Dir- ector of Revenue and Taxation does not affect the applicant's ability to exercise reasonable and ordinary con- trol in operating a motor vehicle upon the highway shall not prevent the issuance of a license or permit to the application.

(6) Who has been certified by the Department of Law as being in non-compliance with a court order of sup- port, unless a confirmation of compliance from the Department of Law or the Superior Court of Guam is re- ceived by the Director of Revenue and Taxation.

(i) The Director of Revenue and Taxation may disapprove the application:

(1) If he is satisfied that the applicant is not entitled thereto under the provisions of this Title.

(2) If the applicant has failed to furnish the Department of Revenue and Taxation the information required in the application or any reasonable additional information requested by the Department.

(3) If he determines that the applicant has made or permitted to be made, unlawful use of any operator's or chauffeur's license.

(4) If he determines that the applicant has used a false or fictitious name in any application for a license, or knowingly made a false statement or knowingly concealed a material fact or otherwise committed any fraud in any such application.

(5) If he determines that the applicant is a negligent or incompetent operator of a motor vehicle. Any person who has been convicted on four (4) or more occasions in a consecutive period of twelve (12) months, or six (6) or more occasions within a consecutive period of twenty-four (24) months, or eight (8) or more occasions within a consecutive period of thirty-six (36) months of violations of the provisions of the Vehicle Code in- volving the safe operation of vehicles on the highway and which are by law required to be reported to the De- partment of Revenue and Taxation shall prima facie be presumed to be a "negligent operator of a motor vehicle."

(j) Every license and permit shall state whether it is an operator's or chauffeur's license or instruction permit and shall bear thereon the distinguishing number assigned to the application, the dates of issue and expiration,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the name, date of birth, residence address, height, weight, color of eyes, a photograph of the licensee (except that the instruction permit shall not bear a photograph of the licensee) and a space upon which the licensee shall write his usual signature. No license shall be valid until it has been signed by the licensee. In the case of a chauffeur's license, the license shall also state whether it is a general or restricted license, and if restricted, the type of vehicle or combination of vehicles the licensee is permitted to operate. Each license and permit shall also contain a space for common restrictive requirements such as corrective lenses, hearing aid, hand control or pedal extension, left foot accelerator, no night driving or other.

(k) The licensee or permittee shall have his license or permit in his immediate possession at all times when driving a motor vehicle upon a highway and when so driving shall display such license or permit upon demand of a member of the Guam Police or any peace or traffic officer enforcing the provisions of this Title. Any charge under this Subsection shall be dismissed when the person so charged produces in court an operator's or chauffeur's license duly issued to such person and valid at the time of his arrest.

(l) Every operator's or chauffeur's license hereafter issued shall expire three (3) years after the first anniversary of the date of birth of any applicant occurring after the date of issuance. The anniversary of the date of birth of any applicant born on February twenty-ninth (29th) shall, for the purposes of this Section, during the years in which there is no February twenty-ninth (29th), be considered as March first (1st). Every such license shall be renewable for a like period within ninety (90) days prior to its expiration. Any license that would otherwise expire on a Saturday or legal holiday shall be valid until the next business day. An applicant for renewal of license shall make application therefor in the same manner as in the case of an original application for a license upon such form as may be required. The Director of Revenue and Taxation at his discretion may require an examination of the applicant as upon an original application. To the extent its facilities permit, the Department of Revenue and Taxation shall, in the course of its investigation, check the record of the applicant for convictions for traffic violations and traffic accidents, and may withhold or refuse certification of eligibility for a license or renewal of a license unless satisfied upon reasonable proof that the applicant can and will operate a motor vehicle safely.

(m) In the event a license or permit issued under this Title is lost, destroyed or mutilated, the licensee or permittee may obtain a duplicate from the Department of Revenue and Taxation upon making satisfactory proof of such fact. Any person who loses a license or permit and thereafter finds the original must immediately surrender such original to the Department of Revenue and Taxation.

(n) After passing an examination as required under Subsection (g) to include an actual demonstration of ability to exercise ordinary and reasonable control in the operation of a motorcycle, an applicant may have his operator's or chauffeur's permit endorsed by the Director of Revenue and Taxation, or his designee, authorizing the applicant to operate a motorcycle on the highways of Guam. The Director of Revenue and Taxation may in his discretion accept evidence of a military motorcycle permit in lieu of this examination and endorsement. No person shall operate a motorcycle on the highway without first complying with this Section except that a person having in his immediate possession a valid motorcycle operator's license issued by any other territory or state of the United States, or by a foreign country, may operate a motorcycle upon the highways for a period not exceeding thirty (30) days from the date such person arrived in Guam. The requirement that the person pass an examination and receive an endorsement for operation of a motorcycle shall not be applicable to the operation of a motorcycle when a sidecar is attached to the motorcycle. Any person who operates a motorcycle in violation of this Title shall be guilty of a petty misdemeanor.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**SOURCE:** GC § 23100, enacted by P.L. 1-88 as amended by P.L. 12-155. Subsection (c) as amended by P.L. 14-72:5; (e) and (j) as repealed and reenacted by P.L. 14-92:1; (n) as amended by P.L. 13-187:143 and P.L. 16-114:15. Subsection (e)(12) amended by P.L. 22-20:9(d). Subsection (h)(1) amended by P.L. 22- 20:9(e). Subsection (a) repealed by P.L. 22-20:5. Subsection (c) amended by P.L. 22-146:21 (12/29/94). Subsection (a) repealed and reenacted by P.L. 24- 116:2. Subsection (h)(6) added by P.L. 24-116:3, expired on 9/30/1999 by operation of P.L. 24-116:13 and reenacted in its present form by P.L. 25-161:3, effective on July 10, 2000.

NOTES, REFERENCES, AND ANNOTATIONS

**NOTE:** § 3101 (a) was originally repealed by P.L. 22-20:5 under the 22nd Legislature. The 24th Legislature just passed P.L. 24-116:2 which repealed and reenacted (a) of § 3101.

**CROSS-REFERENCES:** See § 3110 of this Chapter for what appears to be a replacement section for subsection (a). Former subsection (a) positively required that a person carry in his possession an appropriate driver*s license. It also defined the difference between an operator*s and chauffeur*s license.

**NOTE:** P.L. 22-72:48(c) states, with respect to the requirement that all new drivers take a course in drivers education:

The references in subsection (e)(12) [Section 9 of Public Law 22-20] to "individuals applying for a new Guam drivers license" or "applying for a license for the first time" shall mean any individual or applicant who does not possess a valid drivers license issued by any state or territory of the United States.

**CROSSREFERENCES:** With respect to taking Drivers* tests in foreign languages, the Legislature stated in P.L. 21-138, as amended by P.L. 22-121:

**Section 1. (a) Legislative findings.** The Legislature finds that the diverse ethnic makeup of the territory of Guam has resulted in many people who wish to drive having had difficulty obtaining driver's licenses from the Division of Motor Vehicles because of their lack of English language skills. In the past, the Motor Vehicle Division personnel have allowed applicants to use translators. This system, which has not been successful in other jurisdictions, is not reliable. California has translated the driver's examination into several languages and has included all requested language translations in its computer data bank. The Department of Revenue and Taxation, Division of Motor Vehicles, is computerized now and has the same capability to provide translations of study materials and written driver's license examinations.

(b) Within sixty (60) days of the effective date of this amendment, the Department of Revenue and Taxation shall provide study materials and

(c) In any driver's license examination given in a language other than English, all questions about road signs shall use any English word or words written on such signs in describing or depicting such signs. If an applicant needs an interpreter in taking a road driving test in order to understand the commands of the tester, such applicant can bring with him or her during such road test such an interpreter, whose expense shall be for the account of the applicant.

(d) Ten Thousand Dollars ($10,000) are hereby appropriated from the General Fund to the Department of Revenue and Taxation to begin the necessary translations.

6 G.C.A. § 3101, GU ST T. 16, § 3101

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw

GUAM CODE ANNOTATED
TITLE 16. VEHICLES.
CHAPTER 3. GENERAL PROVISIONS
ARTICLE 1. DRIVERS LICENSES
§ 3109. Prohibitions.

A person shall not:

(a) Knowingly permit or authorize the driving of a motor vehicle, owned by him or under his control, upon the highways by another person, whether as operator or chauffeur, unless such other person is duly licensed to drive.

(b) Display or cause or permit to be displayed or have in his possession any cancelled, revoked, suspended, fictitious or fraudulently altered license or permit.

(c) Lend his license or permit to any other person or knowingly permit the use thereof by another.

(d) Display or represent as one's own any license or permit not issued to him.

(e) Fail to refuse to surrender to the Department of Revenue and Taxation, upon lawful demand, any license or permit which has been suspended, revoked or cancelled.

(f) Use a false or fictitious name in any application for a license or permit or knowingly make a false statement or knowingly conceal a material fact or otherwise commit a fraud in any such application.

(g) Permit any unlawful use of a license or permit issued to him.

(h) Photograph, photostat, duplicate or in any way reproduce any license or permit or facsimile thereof in such a manner that it could be mistaken for such a license or permit, or display or have in his possession any such photograph, photostat, duplicate, reproduction or facsimile unless authorized by the provisions of this Title.

**SOURCE:** GC § 23101, enacted by P.L. 1-88 as amended by P.L. 12-155.

.6 G.C.A. § 3109, GU ST T. 16, § 3109

Current through P.L. 27-161 (2004)

Copr. © 2004. Government of Guam

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

GOVERNMENT
EXHIBIT
6 a

Westlaw.

GU ST T. 16, § 3109.1
16 G.C.A. § 3109.1

GUAM CODE ANNOTATED
TITLE 16. VEHICLES.
CHAPTER 3. GENERAL PROVISIONS
ARTICLE 1. DRIVERS LICENSES
§ 3109.1. Punishments.

Any person who violates the provisions of subsections (a) or (e) of § 3109 of this Title shall be guilty of a misdemeanor. Any person who violates the provisions of subsections (b), (c), (d), (f), (g) or (h) of said § 3109 shall be guilty of a felony of the third degree.

**SOURCE:** Added by P.L. 22-20:4 (6/22/93)

.6 G.C.A. § 3109.1, GU ST T. 16, § 3109.1

Current through P.L. 27-161 (2004)

Copr. © 2004. Government of Guam

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.





DEPARTMENT OF

# REVENUE & TAXATION

GOVERNMENT OF GUAM

JOAQUIN G. BLAZ, Director • V.M. CONCEPCION, Deputy Di

DEC 2 7 1989

MEMORANDUM:

TO:        Employees, Motor Vehicle Division

FROM:      Director's Assistant

SUBJECT:   Disclosure of Social Security Numbers

Please read the attached Attorney General's Opinion regarding the prerequisite of the disclosure of social security number.

I requested for this opinion to avoid the problem we had with a Mrs. Linda R. Ahlgreen who refused to disclose her social security number when applying for her driver's license.

With this Attorney General's Opinion, anyone who refuses to provide his or her social security number shall be refused the issuance of either his or her driver's license or vehicle registration.

The Department will be issuing an official and formal policy on this subject within the next few days. Our Director is Off-Island at this time.

The attached copy is for your permanent file and for your references.

Thank you.

JOAQUIN L.G. DIEGO



GOVERNMENT EXHIBIT 7



Department of Revenue & Taxation
GUAM
DEC 13 1989
Initial:

GOVERNMENT OF GUAM
AGANA, GUAM 96910

December 5, 1989

Memorandum (Opinion)          Ref:  DRT 89-1449

To:        Director, Department of Revenue and Taxation

From:      Attorney General

Subject:   Social Security Number Prerequisite to Issuance
           of Driver's License and Vehicle Registration

We received your memorandum dated October 5, 1989, in which you
requested this office's legal opinion on the following:

REQUEST NO. 1: Can the Department of Revenue and Taxation (herein-
               after "Department") withhold issuance of a driver's
               license or motor vehicle registration from an
               applicant if such applicant refuses to disclose his
               or her social security number?

ANSWER:        Yes.  See discussion.

REQUEST NO. 2: If the Department can withhold a driver's license
               or vehicle registration from an applicant for such
               applicant's refusal to disclose his or her social
               security number, must the Department adopt regu-
               lations in order to do so?

ANSWER:        No.  See discussion.


STATEMENT OF FACTS:

The Department's Motor Vehicle Division has been challenged on its
policy of requiring social security numbers from applicants as a
prerequisite to motor vehicle registrations and issuance of
driver's licenses.

Not only does the Department utilize and require disclosure of
social security numbers for driver's license and motor vehicle
registration administration, it has, in one known instance,
withheld issuance of a driver's license due to the applicant's
failure or refusal to disclose his or her social security number.

The Department is currently authorized by 16 GCA Sections
3101(e)(12) and 7105(c) to require information, which is necessary
and reasonable, from applicants of driver's licenses and motor
vehicle registrations.

DISCUSSION:

Answer to Request No. 1:

Pursuant to 16 GCA Section 3101(e)(12), an applicant for a driver's license must submit an application to the Department which sets forth, among other things "any other information necessary to determine whether such applicant is entitled to a license ...." Such section provides in relevant part:

> ... an applicant for a license or permit shall submit an application to the Department of Revenue and Taxation on a form prescribed by it, verified under oath and containing the following information:
>
> ...any other information necessary to determine whether the applicant is entitled to a license under this Title. (Emphasis added) Id.

In addition, 16 GCA Section 7105(c) authorizes the Department to require on applications for motor vehicle registrations "such additional information as may reasonably be required by the Department." Such section provides in relevant part:

> The owner of a vehicle of a type required to be registered under this Title shall make application to the Department of Revenue and Taxation for registration of the vehicle upon a form furnished by that Department. The application shall contain:
>
> ... such additional information as may reasonably be required by the Department. (Emphasis added) Id.

Hence, pursuant to the above-referenced sections of the Guam Code Annotated, the Department may require from an applicant disclosure of certain information which is necessary or reasonable for the purpose of administering driver's license and motor vehicle registration laws.

The Federal Privacy Act (P.L. 93-579, Section 7), 5 U.S.C. § 522a (note), sets forth the general rule which prohibits state, local or federal government agencies from denying a legal privilege from an individual based on such individuals's refusal to disclose his or her social security number. Furthermore, such section requires federal, state and local government agencies which request disclosure of social security numbers from individuals to inform them "whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited and what uses will be made of it." Id.

However, 42 U.S.C. § 405(c)(2)(c)(i) effects an implied exception to the general rule by allowing state, federal and government agencies to utilize social security numbers for the purpose of administering driver's license and motor vehicle registration laws. Such section provides in relevant part:

> ... any State (or political subdivision thereof) may, in the administration of ... driver's license or motor vehicle registration law within its jurisdiction, utilize the social security account numbers ..." Id.

For purposes of reading such section, "state" includes Guam. 42 U.S.C. § 405(e)(2)(c)(iv).

In construing the aforementioned 42 U.S.C. § 405(c)(2)(c) rule, (social security number use authorization) together with the 5 U.S.C. §522a rule (requirement that an applicant of a right, benefit or privilege from whom a social security number is solicited be informed that such disclosure is either voluntary or mandatory), it becomes clear that failure to disclose in mandatory cases will result in the denial of the right, benefit or privilege.

Case law indicates that in connection with motor vehicle registration and driver's license laws, disclosure of social security numbers may be required from applicants for purposes of administration [ Doyle v. Wilson, 529 F.Supp. 1343 (D.C. Del. 1982)], but only if the agency requesting the disclosure of social security numbers informs the applicant as to whether disclosure is mandatory or voluntary, by what statute or other authority such number is solicited, and what uses will be made of it [Doyle v. Wilson, supra; See also Yeager v. Hackensack Water Co., 615 F.Supp. 1087 (D.C.N.J. 1985); Greater Cleaveland Welfare Rights Organization v. Bauer, 462 F.Supp. 1313 (D.C. Ohio 1978); State v. Hughes, 442 N.E.2d 786, 2 O.B.R. 538, 2 Ohio App.3d 433 (1981)].

In the case at hand, the Department requires disclosure of social security numbers from applicants of driver's licenses and motor vehicle registrations for purposes of administration prior to the issuance of either the driver's license or the vehicle registration. In addition, as noted above, 16 GCA Sections 3101(e)(12) and 7105(c) respectively, authorize the Department to require reasonable and necessary information for driver's license and motor vehicle registration administration.

The Department has not indicated whether it has regularly exercised the practice of informing applicants that the disclosure of social security numbers is mandatory, that it is authorized to require disclosure of social security numbers pursuant to GCA §§ 3101(e)12) and 7105(c) and that the social security number is

necessary for the purpose of administration, i.e., the social security number will be used for identification verification and processing purposes.

Therefore, it is the opinion of this office that pursuant to Guam and Federal law, the Department is authorized to require from applicants for driver's licenses and motor vehicle registrations disclosure of social security numbers for the purpose of administering the laws incident thereto so long as the Department, in written form, informs the applicant of the following:

1)   the statutory authority under which the social security number is solicited,

2)   what uses will be made of the social security number, and

3)   whether the disclosure is mandatory or voluntary.

It therefore follows that should an applicant refuse to disclose his or her social security number in an application for a driver's license or motor vehicle registration, the Department can refuse to process such application until the authorized necessary information is provided by the applicant.

Answer to Request No. 2

In connection with an agency requiring disclosure of social security numbers for purposes of administering driver's license and motor vehicle registration laws, it is clear that 5 U.S.C. § 552(a), discussed above, requires some legal grant of authority under which the disclosure requirement may be made. Doyle v. Wilson, supra; See also: Alcaraz v. Block, 746 F.2d 593 (C.A.Cal. 1984); Yeagar v. Hackensack Water Co., supra; Greater Cleaveland Welfare Rights Organization v. Bauer, supra; State v. Hughes, supra. In addition, case law indicates that "administrative practice" alone, absent any discrete legal grant of authority, is not sufficient to support such requirement. Doyle v. Wilson, supra.

In the case at hand, the Department is authorized to require disclosure of social security numbers by 16 GCA §§3101(e)(12) and 7105(c), neither of which mandates the promulgation of regulations in connection with obtaining "reasonable" and "necessary" information for the purpose of administering driver's licenses and motor vehicle registrations.

Therefore, it is the opinion of this office that the Department is not required to adopt regulations for the purpose of making mandatory the social security number disclosure requirement for applicants of driver's license and motor vehicle registrations.

Memo to Dir., Dept. of Rev. & Tax.
December 5, 1989
Page 5


This memorandum is issued as an opinion of the Attorney General.
For a faster response to any inquiry about this memorandum, please
use the reference number shown.

OFFICE OF THE ATTORNEY GENERAL

By: _____
MARIA L. JOSE
Assistant Attorney General

Dipåttamenton Kontribusion yan Adu'ånå
DEPARTMENT OF
**REVENUE AND TAXATION**
GOVERNMENT OF GUAM Gubetnamenton Guåhan

CARL T.C. GUTIERREZ, Governor Maga'l
MADELEINE Z. BORDALLO, Lt. Governor Tiñente Gubetnadc

**MEMORANDUM**

To: Driver's License Branch

From: Administrator

Subject: **DRIVER'S IDENTIFICATION NUMBER**

Date: June 02, 1997

Effective immediately, only the Social Security Number will be recognized and honored as the Driver's Identification Number when processing applicants for a Guam Driver's License.

Those applicants who desire a license, and do not possess a social security card, or who are in the process of applying for a card; will be issued a temporary license in lieu of the actual driver's license. The temporary license will expire sixty (60) days from the date of issuance. Upon receipt of the social security card, the actual driver's license can then be generated and released.

The above processing procedures must be adhered to; failure to comply will result in disciplinary action.

Should you require clarification and/or have any concerns regarding this matter, please see me.

MARIA C. FLORES

[✓] Concur

[ ] Non-concur

**JOSEPH T. DUENAS, Director**




Post Office Box 23607, Guam Main Facility, Guam 96921 • Tel. / Telifon: (671) 475-1801/1785-89 • Fax / Faks: (671) 472-2643

Dipåttamenton Kontribusion yan Adu'ånå
DEPARTMENT OF
# REVENUE AND TAXATION
GOVERNMENT OF GUAM Gubetnamenton Guåhan

CARL T.C. GUTIERRE
MADELEINE Z. BORDALLO, Lt. Governor

JOSEPH T. DUE
CARL E. TOR

FEB 05 1999

MEMORANDUM

To: Administrator, Motor Vehicle Division

From: Director

Subject: Requirement for Driver's License

Individuals applying for a Guam Driver's License, who do not have and are not eligible to get a Social Security Number, may use an Individual Taxpayer Identification Number to fulfill the requirement of having a social security number.

JOSEPH T. DUENAS

**DEPARTMENT OF**
# REVENUE AND TAXATION
**GOVERNMENT OF GUAM**    Gubetnamenton Guåhan

CARL T.C. GUTIERREZ, Governor Maga'
MADELEINE Z. BORDALLO, Lt. Governor Tiñente Gubetnad

GEORGE V. CRUZ, Dire
Direi
JOHN P. CAMACHO, Acting Deputy Dire
Actot Sigundo Dire

## MEMORANDUM

TO:      **MOTOR VEHICLE DIVISION**

FROM:    Administrator

SUBJECT: **VERIFICATION OF SOCIAL SECURITY CARD**

DATE:    October 31, 2002

This serves as a reminder of our responsibility to ensure that all applicants seeking a driver's license or registration and titling of a vehicle meet with all licensing requirements. The requirements include having in their possession a valid Individual Taxpayer Identification Number (ITIN) or Social Security Card (SSC) or a written verification from the Social Security Administration prior to being issued a driver's license or vehicle registration and title. With regard to vehicles owned by registered corporations, the Employer Identification Number (EIN) will serve in lieu of a Social Security Number or ITIN.

Your attention is called to previous directives emphasizing these licensing requirements which were dated June 2, 1997 and February 5, 1999. In order to maintain reliable and correct information it is imperative that we all comply with these directives to avoid any discrepancies in our licensing system i.e. duplication of Social Security Numbers or fraudulent use of a Social Security Number.

Your failure to adhere to these directives may potentially compromise the integrity and reliability of our licensing information.

Therefore, blatant disregard to administer and enforce these directives may result in disciplinary action against the employee.

Should you require clarification and/or have any concerns regarding this matter, please see me.

*Maria C. Lopez*
MARIA C. FLORES

Attachment



GOVERNMENT
EXHIBIT

*10*

CAR0615 800-783-0259

Post Office Box 23607, Guam Main Facility, Guam 96921 • Tel. / Telifon: (671) 475-1801/1785-89 • Fax / Faks: (671) 472-2643

Case 1:05-cr-00064    Document 111-2    Filed 03/08/2008    Page 22 of 89



FELIX P. CAMACHO, Governor Maga'låhi
KALEO S. MOYLAN, Lt. Governor Tñente Gubetnadora

# DEPARTMENT OF
# REVENUE AND TAXATION
**GOVERNMENT OF GUAM**  Gubetnamenton Guåhan

ARTEMIO B. ILAGAN, Director
Direktot
JOHN P. CAMACHO, Deputy Director
Segundo Direktot

## MEMORANDUM

July 16, 2004

To:  Driver's License Examination Branch Personnel

From:  The Director

Subject:  Passport numbers

Since the tragedy of 9/11, the Internal Revenue Service and the Social Security Administration have reevaluated their policies regarding the issuance of the Income Tax Identification Number (ITIN) and the Social Security Number (SSN). Both agencies will no longer issue numbers solely for the privilege of driving. Due to this, many individuals who are on Guam for a limited time are denied a Guam Driver's License.

Many of these people, who are denied, are spouses of those who are contracted by private companies for a year or two to work on Guam. These spouses' immigration status will not permit them to work on Guam. Without a visa allowing them to seek employment, an ITIN will not be issued to them. Another group of people, as a second example, denied the opportunity to seek employment are those traveling on student visas. Many of these individuals may be on Guam for two to four years pursuing an associate or bachelor degree, but are unable to obtain either number.

Several years ago, passport numbers were being utilized as identification numbers. I wish to reestablish this policy to allow those with passports to be allowed the opportunity to obtain a driver's license. The following will be requirements for all applicants:

1.  The applicant must submit denial letters from both the Internal Revenue Service and the Social Security Administration. If a customer does not have a denial letter specifically addressed to him, but claims he is one of a specific group of people being denied an ITIN or SSN, he must show proof of his inclusion in the group.

2.  The passport must be valid. The validity of a driver's license will be limited if the passport expires within the statutory three-year period of a Guam Driver's License. If this situation arises, the Guam Driver's License will expire **the day the passport expires**. For those with passport expirations beyond the three-year period of a Guam Driver's License, a full three-year license will be issued.

This new policy will take effect on August 9, 2004.

Artemio B. Ilagan

cc:  Office of the Deputy Director
     Frank R. Blaz, Assistant to the Director



GOVERNMENT
EXHIBIT
11

 Department of Treasury
Internal Revenue Service
Philadelphia, PA 19255

Notice Date:
Notice Number: CP565A
ITIN:

For assistance call us at:
(215)516-4846

Or you may write us at:
P.O. Box 447
Bensalem, PA 19020

### WE ASSIGNED YOU AN IRS INDIVIDUAL TAXPAYER IDENTIFICATION NUMBER(ITIN)

Thank you for your Form W-7, Application for IRS Individual Taxpayer Identification Number. We assigned you ITIN                        . Please keep this notice for your records.

Your ITIN is not a Social Security Number (SSN). It is for income tax purposes only. Please use your ITIN when an SSN is requested on any U.S. Federal Income Tax Return. Use your ITIN on all correspondence with the IRS, including tax payments, refund claims, and any Form 8233 you give to your employer or payer. Form 8233 is used to claim an exemption from U.S. withholding tax. Using any variation in your name or ITIN may cause processing delays and incorrect information on your account.

If you become a U.S. resident or a U.S. citizen, you will probably be eligible to get an SSN. If so, you must then apply for an SSN from the Social Security Administration and start using that number for tax purposes instead of your ITIN. When you receive an SSN, please send a copy of your social security card, along with a copy of this notice to the address listed above, so that we can update our records.

If you have any questions, please call us at the number listed above.

This card is the property of the Internal Revenue Service (IRS). Use of this card signifies agreement to the current conditions set forth by the IRS.

This card is not valid unless signed by the person identified on the front.

If found mail to: IRS, ITIN Unit
P. O. Box 447
Bensalem, PA 19020

Contact the Philadelphia Service Center on (215) 516-4846 regarding this card.

 Department of the Treasury
Internal Revenue Service

Form 9844 (7-96)
Catalog No. 22337C

 Department of the Treasury
Internal Revenue Service

IRS Individual Taxpayer Identification Number

This number has been established for

To be used for tax purposes only

_____
Signature


GOVERNMENT
EXHIBIT
/2

0528529740

Department of the Treasury
Internal Revenue Service
Philadelphia Campus

Date of this notice: 02/04/2004
Number of this notice: CP-565A
Form: W-7
Case Reference Number:982960100142
DOB: 10/08/1975

For assistance call us at:
(215)516-ITIN (4846)
This is not a toll free number

Or you may write to us at:
Internal Revenue Service
Post Office Box 447
Bensalem, PA 19020

MINAMI TOKUNAGA
PMB 750 1270 N MARILZO DR STE 101
TAMUNING GU 96913

## WE ASSIGNED YOU AN INDIVIDUAL TAXPAYER IDENTIFICATION NUMBER (ITIN)

ITIN 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    Thank you for your Form W-7, Application for IRS Individual Taxpayer Identification Number. We assigned you
Please keep this notice for your records.

Your ITIN is not a social security number (SSN) and is to be used for income tax purposes only. Issuance of
the ITIN does not create any inference regarding your immigration status or your right to work in the United States. Receipt
of an ITIN does not make you eligible to claim the earned income credit (EIC).

Please use your ITIN when an SSN is requested on any U.S. federal income tax return. Use your complete name
and ITIN on all correspondence with the IRS, including tax returns, tax payments, and refund claims. Using any variation in
your name or ITIN may cause processing delays and incorrect information on your account. If you do not use your ITIN for
income tax purposes your ITIN will be revoked.

If you become a U.S. citizen, you will be eligible to get an SSN. You must then apply for an SSN from the Social
Security Administration and start using that number for tax purposes instead of your ITIN. When you receive an SSN, please
send a copy of your social security card with a copy of this notice to the address listed above, or visit your local IRS office, so
we can update our records.

If you have any questions, please call us at the number shown above.

GOVERNMENT
EXHIBIT
13

GOVERNMENT EXHIBIT 14
CARDELL 800-283-0599

| APPLICANT | ITIN | ADDRESS | APPLIED | WRITTEN | ISSUED |
|---|---|---|---|---|---|
| Sam Bang LEE | TXXX-XX-5285 | 151 West Malate St PO Box 11846 | | 12/16/03 | 12/23/03 |
| Young Joo BAEK | TXXX-XX-6523 | 151 W. Malate St PO Box 11846 | | 1/09/04 | 1/15/04 |
| Larn JO | TXXX-XX-4698 | A108 PiaMarine PO Box 11846 | | 1/3/04 | 1/28/04 |
| Youn Hee JUN | TXXX-XX-6356 | 308 Pia Marine PO Box 11846 | | 1/27/04 | 1/28/04 |
| 43) Sung Min SHIN 122 809 6863 | TXXX-XX-6981 S.Y.K. | A103 Airport Apt POB 11846/646-0835 | **2/20/04, 1:20 Laserna** | 3/05/04 | 3/10/04 |
| 47) Ki Cheol HAN 122 809 6865 | TXXX-XX-5685 H.S.W. | A103 Airport Apt POB 11846/646-0835 | **2/20/04, 1:23 Laserna** | 3/05/04 | 3/10/04 |
| 71) Jung Soo YANG 122 809 6851 | TXXX-XX-5679 W.T. | A-309 Pia Marine POB 11846 | **2/23/04, 8:45 Laserna** | 3/05/04 | 3/10/04 |
| 42) Young Min KO 122 809 6843 | TXXX-XX-6975 S.H.L. | A109 Airport Apt POB 11846 | **2/23/04, 1:19 Laserna** | 3/05/04 | 3/10/04 |
| 34) Geun Jae LEE 122 809 6868 | T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 Fictitious | 801 Pia Marine POB 11846 | **2/23/04, 1:25 Laserna** | 3/05/04 | 3/10/04 |
| 26) Seung Pill CHOI 122 809 6852 | T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 Fictitious | A801 Pia Marine POB 11846 | **3/01/04, 8:32 Laserna** | 3/05/04 | 3/10/04 |
| 2) Dong Pyo HONG 122 809 6842 | T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 Fictitious | A108 Airport Apt | **3/01/04, 9:40 Laserna** | 3/05/04 | 3/10/04 |

| Name / ID | SSN | Address | Date, Time / Agent | Date | Date(s) |
|---|---|---|---|---|---|
| 32) Mi Ra KIM 122 809 8786 | T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 Fictitious | A105 BenBea Apt | **3/16/04, 3:14 Laserna** | 4/16/04 | 4/21/04 |
| 27) Ok Sun KIM M/ 122 810 5523 | T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 Fictitious | A108 Tumon Village | **3/16/04, 3:40 Pangelinan** | 3/19/04 | 3/23/04-M 10/27/04 |
| 70) Deuk Soon CHOI 122 809 9758 | TXXX-XX-1770 C.B. | 1109 Pia Marine | **3/16/04, 3:37 Laserna** | 3/24/04 | 3/26/04 |
| 24) Chun Ja CHO 122 809 8866 | T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 Fictitious | A109 Airport Apt | **4/12/04, 3:19 Laserna** | 4/16/04 | 4/23/04 |
| 3) Sung Jun HAN 122 809 8867 | T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 Fictitious | A109 Airport Apt | **4/14/04, 9:55 Untalan** | 4/16/04 | 4/23/04 |
| 4) Sang Jin PARK 122 809 9970 | T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 Fictitious | A109 Harmon Villa | **5/05/04, 4:32 Duenas** | 5/14/04 | 4/23/04 |
| 1) Jong Yeon HWANG M | T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 Fictitious | A109 Pia Resort | **5/20/04, 2:55 Laserna** | 5/29/04 | 6/02/04 |
| 21) Jun Sung MIN 122 810 0584 | T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 Fictitious | A109 Airport Apt | **5/25/04, 9:43 Laserna** | 5/28/04 | 6/04/04 |
| 30) Hae Sook KANG 122 810 0582 | T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 Fictitious | A109 Beachway Apt | **5/25/04, 10:04 Laserna** | 5/28/04 | 6/04/04 |
| 25) Haeng Hwa LEE 122 810 0592 | T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 Fictitious | A109 Pacific Tower | **5/26/04, 1:41 Kawamoto** | 5/28/04 | 6/04/04 |
| 23) Jung Il CHAE M | T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 Fictitious | A19 Airport Apt | **5/26/04, 1:13 Kawamoto** | 5/28/04 | 6/02/04 |
| 8) Ha Young KIM M/122 810 7887 | T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 Fictitious | A109 Airport Apt | **7/06/04, 9:50 Duenas** | 7/9/04 | 7/13/04M 2/03/05 |

| Name / ID | ID Number | Address | Date/Time | | |
|---|---|---|---|---|---|
| 6) You Soon KIM 122 810 1989 | T946-159803 Fictitious | A109 Cruz Apt | 7/06/04, 1:03 Duenas | 7/9/04 | 7/14/04 |
| 54) Kil Ja LEE M/122 810 8105 | TXXX-XX-7923 T.A. | A109 Airport Apt | 7/20/04, 9:34 Garcia | 7/23/04 | 7/27/04M 3/13/06 |
| 11) Keun Seok BANG 122 810 2441 | T952-020460 Fictitious | A19 Cruz Apt | 7/20/04, 3:31 Garcia | 7/23/04 | 7/28/04 |
| 61) Jin Woo PARK M/122 810 8151 | TXXX-XX-7906 A.G. | 108B Harmon Villa | 7/20/04, 4:02 Garcia | 7/23/04 | 7/27/04M 2/18/05 |
| 22) Sang C RYU 122 810 3034 | T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 Fictitious | 301 Airport Apt | 8/03/04, 12:16 Duenas | 8/6/04 | 8/12/04 |
| 5) Jeong Min HAM 122 810 2977 | T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 Fictitious | A109 Pia Marine | 8/03/04, 12:53 Duenas | 8/6/04 | 8/11/04 |
| 29) Kyoung Kwa BAEK 122 810 3470 | T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 Fictitious | A806 Pia Marine | 8/14/04, 1:36 Pablo | 8/20/04 | 8/25/04 |
| 28) Young Hee LEE M | T953-197123 Fictitious | A109 Pia Marine | 8/17/04, 10:17 Pablo | 8/20/04 | 8/25/04 |
| 7) Jae Min LEE 122 810 5782 | T946-198060 Fictitious | 301 Sunset Apt | 8/26/04, 4:05 Laserna | 10/29/04 | 11/04/04 |
| 56) Tae Kwun JUNG 122 810 5786 | TXXX-XX-0968 J.C.E. | 303 Airport Apt POB 11098 | 10/25/04, 2:30 Laserna | 10/29/04 | 11/04/04 |
| 13) Won Il KOH 122 810 5781 | T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 Fictitious | 309 Harmon Villa POB 11089 | 10/25/04, 2:46 Laserna | 10/29/04 | 11/04/04 |
| 12) In Hwan CHO 122 810 6231 | T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 Fictitious | A301 Airport Apt | 11/09/04, 10:33 Laserna | 11/12/04 | 11/19/04 |

| Name | ID | Address | Date/Time | Date | Date |
|---|---|---|---|---|---|
| 19) Hyuk Su KANG 122 810 6127 | T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 Fictitious | A109 Benson Apt | **11/09/04, 10:39 Laserna** | 11/12/04 | 11/17/04 |
| 63) Myung Sug KIM 122 810 6732 | TXXX-XX-8820 A.M.G. | 109A Airport Apt | **11/30/04, 2:15 Laserna** | 12/03/04 | 12/09/04 |
| 33) Jae Hoan SEOK 122 810 6836 | T963-901908 Fictitious | A17 Tunca Apt | **11/30/04, 2:22 Laserna** | 12/3/04 | 12/13/04 |
| 51) Tae Ho KIM 122 810 6768 | TXXX-XX-219 F.L. | 109 Sunset Apt POB 11846 | **11/30/04, 2:51 Laserna** | 12/02/04 | 12/10/04 |
| 18) Dong Sik JUNG 122 810 7943 | T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 Fictitious | 709 Pia Marine POB 19068/646-8197 | **1/18/05, 12:03 Untalan** | 1/22/05 | 2/08/05 |
| 75) Ji Eon LEE 122 810 7745 | T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 H.N. | A709 Pia Marine POB 19068/646-8197 | **1/18/05, 12:07 Untalan** | 1/25/05 | 1/27/05 |
| 52) Min Chul LEE 122 710 7744 | TXXX-XX-4916 C.S. | 151 W. Malate St 646-8197 | **1/18/05, 12:21 Untalan** | 1/22/05 | 1/27/05 |
| 15) Sang Ho KIM 122 810 8003 | T952-105064 Fictitious | A109 Airport Apt | **1/31/05, 10:57 Kawamoto** | 2/5/05 | 2/10/05 |
| 62) Hak Ja PARK M | TXXX-XX-8139 A.F. | 109A Airport Apt | **3/11/05, 10:48 Laserna** | 3/19/05 | 3/22/05 |
| 16) Tong Hun LEE 122 810 8858 | T952-134058 Fictitious | A109 BenBea Apt | **3/15/05, 9:19 Pangelinan** | | 3/24/05 |
| 35) Tae Sung CHOI 122 810 9153 | T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 M.S. | 301 Airport Apt | **3/29/05, 8:54 Pangelinan** | 4/02/05 | 4/08/05 |
| 20) Sang Mee CHUN **TNF 122 810 9144 | T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 Fictitious | 301 Airport Apt | **3/29/05, 10:36 Pangelinan** | 4/02/05 | 4/07/05 |

| Name / ID | SSN / License | Address | Date/Time, Officer | | |
|---|---|---|---|---|---|
| **Mike Park 122 810 8937 | SS XXX-XX-2006 | Harmon Villa Garden | 3/29/05, 10:31 Pangelinan | 4/02/05 | 4/08/05 |
| 64) Yu Suk KANG 122 810 9358 | T963-722809 L.A.F. | 9 Dungca Apt | 4/12/05, 1:55 Pangelinan | 4/16/05* | 4/21/05 |
| 58) Yeong Beom GIM 122 810 9359 | T952-737051 S.F. | 9 Dunca Apt | 4/12/05, 2:06 Pangelinan | 4/16/05 | 4/21/05 |
| 55) Ang Mi CHOI 122 810 9311 | TXXX-XX-8058 E.I. | A301 Cruz Apt | 4/12/05, 2:53 Pangelinan | 4/16/05 | 4/20/05 |
| 14) Mi Jung KIM 122 810 9667 | T952-102806 Fictitious | A301 BenBea Apt | 5/03/05, 10:45 Kawamoto | 5/07/05 | 5/12/05 |
| 50) Kyung Ja PARK 122 811 0900 | TXXX-XX-4019 S.A. | 109 Airport Apt | 7/20/05, 12:03 Garcia | 7/23/05 | 7/28/05 |
| 73) Jum Soo PARK M | TXXX-XX-1497 R.M. | A109 Cruz Apt | 8/02/05, 10:40 Garcia | 8/09/05 | 8/09/05 |
| 74) Sung Hun KANG | TXXX-XX-5067 S.P. | A301 Benbea Apt | 8/02/05, 10:57 Kawamoto | 8/09/05 | 8/15/05 |
| 9) Sung Kyu HONG M | T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 Fictitious | 205 Airport Apt | 8/03/05, 2:17 Laserna | 8/6/05 | 8/09/05 |
| 17) Dongmi KANG 122 811 1820 | T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 Fictitious | 109 Airport Apt | 9/14/05, 2:11 Kawamoto | 9/17/05 | 9/21/05 |
| 31) Young Nam KIM 122 811 2661 | T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 Fictitious | 205 Tumon View | 11/09/05, 10:51 Untalan | 11/12/05 | 11/18/05 |

**LEE ARRESTED 11/14/05**

| Name / ID | SSN / License | Address | Date/Time, Officer | | |
|---|---|---|---|---|---|
| 10) Jung Ja OH M | T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 Fictitious | A105 Sabana Plaza | 11/28/05, 9:46 Untalan | | 12/07/05 |

other Anadromous Fish Conservation Act programs were also authorized by H.R. 5663.

9. Estimate prepared by: Anne E. Hoffman (226–2860).

10. Estimate approved by:

JAMES L. BLUM,
*Assistant Director for Budget Analysis.*

\* \* \* \* \*

## FALSE IDENTIFICATION CRIME CONTROL ACT OF 1982

*P.L. 97–398, see page 96 Stat. 2009*

House Report (Judiciary Committee) No. 97–802,
Sept. 10, 1982 [To accompany H.R. 6946]

House Conference Report No. 97–975, Dec. 17, 1982
[To accompany H.R. 6946]

Cong. Record Vol. 128 (1982)

DATES OF CONSIDERATION AND PASSAGE

House September 14, December 17, 1982

Senate October 1, December 19, 1982

The House Report and the House Conference Report are set out.

### HOUSE REPORT NO. 97–802

[page 1]

The Committee on the Judiciary, to whom was referred the bill (H.R. 6946) to amend title 18 of the United States Code to provide penalties for certain false identification related crimes, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

\* \* \* \* \*

#### PURPOSE OF THE LEGISLATION

H.R. 6946, as reported by the Committee, would amend chapter 47 of title 18 of the United States Code, relating to fraud and false statements. The bill has two primary purposes. First, it provides for offenses involving federal identification documents, including counterfeiting and trafficking in counterfeits. Second, it creates certain federal offenses relating to counterfeiting and trafficking in counterfeits and stolen state, local, and foreign identification documents.

3519



GOVERNMENT
EXHIBIT

15

## BACKGROUND

In November, 1974, Attorney General William Saxbe established a Federal Advisory Committee on False Identification (FACFI),

[page 2]

made up of representatives of federal, state and local governments, private enterprise and various interest groups, to study the nature and scope of the criminal use of false identification and to recommend steps to combat it consistent with privacy rights. On October 8, 1976, the Committee submitted its Report to Attorney General Edward H. Levi, in which it concluded that false identification documents could be obtained readily and inexpensively throughout the United States from a variety of commercial sources, and that genuine government identification documents could be easily obtained from the issuing offices by means of simple misrepresentations.

The Report outlined the "paper trip" whereby a certified copy of the birth certificate of a deceased person is used as a "breeder document" to acquire a driver's license, social security card and other documents, thus providing the evidence to support the creation of a new identity.

False identification was found to be a major factor facilitating drug smuggling, illegal immigration, flight from justice, fraud against business and the government, and other criminal activity, at an estimated cost of over $16 billion each year. Specifically, the Committee noted that: (1) 80% of the hard drugs entering the United States were smuggled in by rings using false identification; (2) the tax burden caused by illegal aliens using false identification was estimated to be in excess of $12 billion per year; (3) a random survey of fugitives by the FBI found that all of them used false identification and that some of them had more than 30 identities; and (4) false identification cost American business over $1 billion each year in check and credit card fraud, securities fraud, and embezzlement. U.S. Department of Justice, THE CRIMINAL USE OF FALSE IDENTIFICATION: THE REPORT OF THE FEDERAL ADVISORY COMMITTEE ON FALSE IDENTIFICATION (November, 1976) ("FACFI Report") at xii–xv.

Later reports by the General Accounting Office confirmed the conclusion of the FACFI report.

In a 1980 study, the General Accounting Office cited estimates by the Departments of Health and Human Services and Transportation that crimes based on false identification cost the American taxpayers more than $15 billion annually. General Accounting Office, REISSUING TAMPER-RESISTANT CARDS WILL NOT ELIMINATE MISUSE OF SOCIAL SECURITY NUMBERS (HRD–81–20, December 23, 1980) at 10.

In an August 6, 1981 GAO Report, the Department of State estimated that while the precise extent of the problem is unknown, one percent of the passport applications each year (or approximately 30,000) are fraudulent and 40 percent of these may involve illegal aliens. One drug ring reportedly acquired over 200 passports before being discovered by federal authorities. General Accounting Office, MANAGEMENT OF THE DEPARTMENT OF STATE OFFICE OF PASSPORT SERVICES NEEDS TO BE IMPROVED (ID–81–39, August 6, 1981) at 34–35.

Case 1:08-cr-00004    Document 111-2    Filed 05/06/2008    Page 32 of 89

The criminal misuse of false identification was further illustrated in testimony before the Subcommittee on Crime of the House Judiciary Committee on May 5, 1982. Congressman Henry J. Hyde reported that recent spot checks by the Attorney General of Illinois revealed that 45% of aliens applying for unemployment benefits

[page 3]

possessed counterfeit cards indicating legal residence in the United States. The Attorney General estimated that that practice could cost the state of Illinois more than $66 million each year in fraudulent unemployment benefits. Hearing before Subcommittee on Crime, House Committee on the Judiciary on False Identification Crime Control Act (97th Cong. 2d Sess.) 1982. Prepared statement of Representative Henry J. Hyde at 2.

The Department of Justice confirmed that the problems identified in the FACFI Report still exist and may even have worsened in light of the increased number of illegal aliens, international terrorists, and drug-smuggling rings in recent years. Hearing before Subcommittee on Crime, House Committee on the Judiciary on False Identification Crime Control Act (97th Cong. 2d Sess.) 1982. Testimony of John C. Keeney at 3.

According to the Treasury Department, counterfeiters of currency are frequently discovered with large quantities of counterfeit social security cards, driver's licenses, food stamp identification cards, and voter registration cards. The Bureau of Alcohol, Tobacco and Firearms has also found that firearms smugglers routinely use fraudulent driver's licenses to acquire firearms. The Customs Service has found that drug couriers use false identification to avoid the reporting requirements of the Bank Secrecy Act. Hearing before Subcommittee on Crime, House Committee on the Judiciary on False Identification Crime Control Act (97th Cong. 2d Sess.) 1982. Statement by Robert E. Powis at 6–7, 2–3.

Senator Gordon Humphrey testified that he was advised by liquor law enforcement officials in his state that the availability of false credentials from sources outside of the state has created chaos for both retailers who are in the business of selling alcoholic beverages and for enforcement officers. Hearing before Subcommittee on Crime, House Committee on the Judiciary on False Identification Crime Control Act (97th Cong. 2d Sess.) 1982. Testimony of the Honorable Gordon Humphrey at 2.

The FACFI Report identified three additional federal interests in assisting the states in fighting the criminal use of false identification. First, the federal government loses substantial sums through benefit programs and matching funds due to false identification fraud. Second, state identification documents serve as source documents for the issuance of federal documents. Third, the federal government is empowered to regulate activities, such as trafficking in false credentials, which affect interstate commerce. FACFI Report at 113.[1] The Report concluded that existing federal law was ineffec-

---

[1] Federal law currently contains a wide assortment of offenses relating to identification documents. Most relate to the misuse, possession, counterfeiting and forging of specific federal documents. *See, e.g.,* 8 U.S.C. 1306 (fraudulent application for alien registration card); 18 U.S.C. 499 (counterfeiting, forging, or altering military pass or permit or using or possessing such with intent to defraud); 18 U.S.C. 506 (forging, counterfeiting or altering the seal of a U.S. agency or possessing such with fraudulent intent); 18 U.S.C. 701 (unauthorized manufacturing, selling or

Case 1:08-cr-00004     Document 111-2     Filed 05/06/2008     Page 33 of 89

possessing identification cards used by U.S. agencies or imitations thereof); 18 U.S.C. 922 (furnishing false identification to acquire a firearm or ammunition); 18 U.S.C. 1423 (use of unlawfully obtained evidence of citizenship or naturalization); 18 U.S.C. 1426 (counterfeiting, or selling naturalization or citizenship papers or equipment to produce certificates); 18 U.S.C. 1543 (forging, counterfeiting or altering a passport or using such a passport); 49 U.S.C. 1472 (forging, counterfeiting or altering aircraft certificates). Two provisions are more general and comprehensive. 18 U.S.C. 1001 makes it a federal offense to knowingly and willfully make or use any false document, knowing the same to contain any false statement or entry, in any matter within the juris-

Continued

[page 4]

tive in deterring false identification crimes because it: (1) did not adequately cover state documents, which are frequently used to obtain federal identification documents, (2) failed to adequately cover criminal conduct relating to specific federal documents, (3) contained insufficient penalties, and (4) was given insufficient enforcement priority.

The legislation endorsed in the FACFI Report was introduced in the 95th Congress by Congressman Hyde as H.R. 7009. In the 96th Congress, the Chairman of the Judiciary Committee, Peter W. Rodino, Jr., and Congressman Hyde reintroduced that bill as H.R. 4278. Although the Committee took no action on that bill, it adopted an amendment offered by Congressman Hyde to the Criminal Code Revision Act of 1980 (H.R. 6915), which would have made it a federal offense, where certain jurisdictional requirements were met, for any person, with intent to defraud another person or a government, to: (1) use fraud to obtain a written identification instrument; (2) use a written identification instrument that has been fraudulently obtained; (3) use any written identification instrument that has been issued for the use of another person; (4) make, conceal, utter, possess or traffic in a counterfeit or forged written identification instrument; or (5) attempt to do any of the foregoing. *See,* H. Rept. 96–1396 at 342–45.

### HISTORY OF THE ACT

On January 5, 1981, Congressman Hyde introduced H.R. 352, the False Identification Crime Control Act, which was identical to H.R. 4278 of the previous Congress.[2] On April 6, 1982, Congressman

diction of any federal agency. 18 U.S.C. 1002 prohibits the knowing possession, with intent to defraud the United States, of any false, altered, forged or counterfeit document for the purpose of enabling another to obtain any sum of money from the United States. Finally, some offenses cover conduct which could be accomplished through the use of false identification. *See, e.g.,* 18 U.S.C. 286 (conspiracy to defraud the United States); 18 U.S.C. 371 (conspiracy to defraud the United States); 18 U.S.C. 911 (impersonating a U.S. citizen); 18 U.S.C. 915 (impersonating a diplomatic officer with intent to defraud the United States or to obtain anything of value).

The FACFI Report concluded that existing law contains many loopholes as illustrated by 42 U.S.C. 408, which contains offenses relating to the Social Security program. FACFI Report at 121. Although counterfeiting and forging are commonly included among the offenses relating to individual federal documents, until December of 1981, there were no such offenses relating to Social Security cards. Public Law 97–123 amended 42 U.S.C. 408(g)(3) to make it a federal felony, punishable by maximum penalty of $5000 and/or 5 years imprisonment, to knowingly alter a social security card issued by the Secretary of Health and Human Services, buy or sell a card that is, or purports to be, a card so issued, or to counterfeit a social security card with intent to sell or alter it. While Congress has addressed this particular problem, in the absence of comprehensive false identification legislation, the potential exists for similar omissions in future offenses.

[2] As introduced, H.R. 352 would have made it a federal offense, punishable by maximum penalties of five years imprisonment and/or a $10,000 fine to: (1) knowingly use or supply false documentation to obtain any federal identification document; (2) travel in interstate or foreign commerce or knowingly utilize any interstate or foreign commerce facility to transport false information for the purpose of obtaining any identification document issued by a State or local government; (3) counterfeit, alter, or use in violation of law, for consideration, any federal iden-

Case 1:08-cr-00004    Document 111-2    Filed 05/06/2008    Page 34 of 89

tification document; (4) counterfeit, alter or use in violation of law, for consideration, an identification document issued by a State or local government, knowing it is being used or intended for use in obtaining a federal identification document; (5) sell a State or federal identification document, knowing it has been counterfeited or altered or is being or is intended to be used to obtain a federal identification document; (6) travel in interstate or foreign commerce or use a facility of interstate or foreign commerce to move a federal, State, or local identification document, knowing it is counterfeit or altered or is being or is intended to be used in violation of federal or State law; or (7) possess or use, or attempt to use, with an intent to defraud, a counterfeit or altered federal identification document or, knowing that the document is to be used in obtaining

Continued

[page 5]

Harold S. Sawyer, the Ranking Republican on the Subcommittee on Crime, introduced H.R. 6105, a bill aimed at the problem of false identification used by minors to avoid the legal drinking ages set by the states. H.R. 6105 would have made it a federal offense, punishable by a maximum penalty of one year imprisonment and/or $1,000, to willfully use the mail to send a birthdate-bearing identification document without adequate assurances (in the form of a written official communication from a federal, state or local government agent, a licensed physician or a hospital) that the birthdate was accurate or the person identified by the document was at least twenty-one years of age.

The Subcommittee met on July 29 and August 3, 1982, to markup H.R. 352. Chairman Hughes offered an amendment in the nature of a substitute, to re-draft the offenses in a more orderly and clear manner and to make certain substantive changes.

The amendment in the nature of a substitute differed from H.R. 352 in the following ways:

1. The amendment limits the application of the act to offenses involving the production and transfer of false identification documents.

2. The coverage of state documents is handled differently. Under the H.R. 352, as introduced, only those state and local documents that were possessed, or used, with the intent to obtain Federal documents were covered. H.R. 6946 deals with all false state and local documents if a jurisdictional element is satisfied. The Committee desired to protect all government issued documents directly.

3. The amendment does not cover interstate travel to transport false information.

4. The maximum penalties provided in H.R. 352 were $10,000 and/or five years of imprisonment for all offenses. However, the Subcommittee felt that the penalties should be graded based on the extent of the danger posed by the activity, the scope of offender's involvement in false identification fraud, and the federal government's interest in the documents involved. The improper production and transfer of birth certificates and driver's licenses (i.e., the so-called "breeder documents"), cases involving federal documents and multiple documents were therefore punished most severely. Possession offenses were punished at a lower level.

5. The possession, use, acquisition and transfer offenses relating to non-federal documents in H.R. 352 required an additional showing of knowledge that the document "is being used or is intended for use in obtaining" a federal identification document. This requirement was not included in the amendment because the Subcommittee desired to protect other government-issued documents directly.

3523

6. The amendment covers documents issued by foreign governments and international organizations, such as the United Nations. Such documents if falsified, or stolen, could facilitate the activities of foreign terrorists and other criminals in this country.

---

federal identification, any State or local identification document. Authorized activities by law enforcement and intelligence agencies and activities under the federal Witness Protection Program were excluded from the Act's coverage.

[page 6]

7. The amendment covers the transfer of stolen documents. H.R. 352 covered only counterfeit or forged documents or those obtained by supplying false information.

8. The amendment punishes conduct "in or affecting" commerce. H.R. 352 required travel or use of mail or a facility of commerce to move documents in interstate or foreign commerce.

9. The amendment includes offenses relating to document-making implements. This comports with similar offenses in existing law. *See, e.g.,* 18 U.S.C. 474 (plates for counterfeiting U.S. securities); 18 U.S.C. 481 (plates for counterfeiting foreign securities); 18 U.S.C. 487 (counterfeit dies for coins).

10. It applies an attempt provision to all offenses.

The Subcommittee amended the definition of document-making implement to provide that only those implements "specially designed or primarily used" for making identification documents would be covered. The Subcommittee also chose to increase the penalty for the offense of producing, transferring or possessing document-making implements with the intent such document-making implement will be used in the production of false identification documents or another document-making implement which will be so used from a misdemeanor to a felony carrying a maximum imprisonment of five years and a maximum fine of $25,000 or both.

The Subcommittee also adopted an amendment offered by Congressman Sawyer to delete most of the offenses relating to possession or use of false identification documents. Many of those offenses are already covered by the law governing misuse of specific documents, *e.g.,* 18 U.S.C., relating to the manufacture, sale or possession of any badge, identification card or other insignia prescribed by the head of any agency of the United States for the use by any officer or employee thereof. Other technical amendments were also adopted.

The Subcommittee rejected an amendment offered by Congressman Sawyer relating to private identification instruments. The amendment would have made it a federal offense to knowingly send a private identification instrument through the mail or via a facility of interstate or foreign commerce when the birth date had not been verified and the individual identified was under the age of 21. The amendment required that verification be made by a government agency, a doctor or health care practitioner present at the birth, or by the hospital or other health care facility where the individual was born. The maximum penalty was $1,000 and/or one year of imprisonment.

The sponsor of the amendment argued that phony private identification documents are a substantial problem in connection with underage drinking and ought to be included in the legislation

Case 1:08-cr-00004     Document 111-2     Filed 05/06/2008     Page 36 of 89

where no official verification of the bearer's age h.
The Subcommittee, by voice vote, declined to expan
erage. In debate on the amendment three reasons were received.
First, the amendment might pose an unreasonable bur's cov-
gitimate organizations which issue identification cards 'ated,
members. Second, the amendment applied only to persons 'e-
twenty-one, even though there might be abuses in connection '.
other age groups. Finally, the Subcommittee felt that, unlike do
ments apparently issued by a government authority, fraudulen

[page 7]

private identification cards could be adequately policed by state
and local officials. Liquor licensees could legitimately refuse to
accept identification documents which were not government-issued.

Most of the problem addressed by H.R. 6105, as it pertained to
government-issued identification, was covered by the bill as amend-
ed by the Subcommittee.

An amendment offered by Mr. Hughes was defeated on a tie
vote, but was adopted in modified form at full Committee.

The Subcommittee ordered H.R. 352, as amended, favorably re-
ported to the full Judiciary Committee, and introduced as a clean
bill.

The Committee on the Judiciary favorably reported the bill on
August 10, 1982, with amendments by a voice vote.

At full Committee two amendments were adopted. The first
amendment adopted prohibits the knowing possession, with intent
to unlawfully use or unlawfully transfer, of five or more false iden-
tification documents or identification documents other than those
issued lawfully for the use of the possessor. The penalty provided
for is a maximum fine of $15,000 and maximum imprisonment for
not more than three years or both. The Committee identified the
possession of large quantities of false identification with the intent
to unlawfully use or unlawfully transfer as a form of conduct that
is closely related to trafficking in or producing false identification.
This amendment was adopted by division, 10 in favor and 3 op-
posed.

The second amendment adopted prohibits the knowing possession
with intent to use to defraud the United States of a false identifica-
tion document or an identification document other than one issued
lawfully for the use of the possessor. This conduct would be a mis-
demeanor with a maximum fine of $5000 and imprisonment of not
more than one year or both. This amendment was narrowed from
an earlier amendment rejected by the Subcommittee.

## ADMINISTRATION POSITION

In testimony before the Subcommittee on Crime, the Justice and
Treasury Departments voiced strong support for H.R. 352 with
some suggested clarifying amendments. In an August 9, 1982 letter
to Subcommittee Chairman Hughes, Assistant Attorney General
Robert A. McConnell indicated that the Administration considered
the bill reported by the Subcommittee a "major step" in providing
federal prosecutors with "a simple and direct tool with which to
combat falsification of identification documents used in a wide vari-

Case 1:08-cr-00004    Document 111-2    Filed 05/06/2008    Page 37 of 89

ety of criminal activities. . . ." The Department felt that the bill would be "considerably strengthened" if it were amended to cover possession of a stolen document or an unlawfully produced document with intent to (1) transfer such document, (2) use it in obtaining a federal identification document, or (3) use it in the commission of a federal felony.

The second of the Department's recommendations is covered by the amendment adopted by the full Judiciary Committee which proscribes possession with intent to defraud the United States. The Department's remaining recommendations are covered by the other amendment adopted by the full Committee if the offender

[page 8]

possesses five or more documents. The Committee felt that any possession offense which did not involve an intent to defraud the United States should focus on major offenders who possess multiple documents. Possession of four or fewer less documents would continue to be punishable under offenses relating to individual documents, e.g., 18 U.S.C. 1426 (knowing possession of counterfeit citizenship or naturalization papers with intent to use unlawfully). In addition, where the offender possesses such documents with intent to commit a federal felony which would involve defrauding the United States, e.g., 18 U.S.C. 286, the Committee's reported bill would proscribe that conduct, irrespective of the number of documents possessed.

## CONCLUSION

H.R. 6946, as reported, will fulfill the recommendations of the FACFI Report and serve as a strong deterrent to false identification-related crime and to the manufacturers and distributors of false identification in particular. However, federal legislation alone cannot eradicate the problem of false identification. The Committee strongly encourages state and local governments and the private sector to complement the federal role in this area with appropriate preventive and enforcement measures.

## SECTION-BY-SECTION ANALYSIS

*Section 1* sets forth the short title, the False Identification Crime Control Act of 1982.

*Section 2* sets forth a new section in chapter 47 of title 18, United States Code, relating to fraud and related activity in connection with identification documents. The new section, § 1028, contains five subsections: (a) the prohibited conduct, (b) the penalties, (c) the jurisdictional circumstances, (d) the definitions, and (e) an exclusion for certain law enforcement, protective and intelligence activities.

Subsection (a) creates five offenses that would exist if one of the jurisdictional circumstances of subsection (c) is also proven to have existed.

The first offense is the knowing production without lawful authority of a false identification document or identification document.

Case 1:08-cr-00004     Document 111-2     Filed 05/06/2008     Page 38 of 89

Identification document is defined in subsection (d)(1) as a document made or issued by or under the authority of a government or an international governmental or quasi-governmental organization, which, when completed with information concerning a particular individual, is of a type commonly accepted for the purpose of identification of individuals. Government includes the Federal Government, State and local governments and foreign governments. Internal governmental or quasi-governmental organizations would include NATO, the European Economic Community, the United Nations, the World Health Organization, the World Bank, etc. Documents covered therefore would include employee identification, student identification cards issued by public schools and universities, driver's licenses, birth certificates. Documents excluded would in-

[page 9]

clude motor vehicle registrations, certificates of title, credit cards, or other privately issued identification.

The Committee intends that a "type" of identification document "commonly accepted for the purpose of identification of individuals" not be restricted to identification documents, such as driver's licenses, which are widely accepted for a variety of identification purposes. The Committee intends that "identification document" also include those which are "commonly accepted" in certain circles for identification purposes, such as identification cards issued by state universities and Federal government identification cards. The definition is intended to include blank identification documents which have not been completed with information relating to a particular individual. Finally, an identification card normally will include such identifying elements as an individual's name, address, date, or place of birth, physical characteristics, photograph, fingerprints, employer, or any unique number assigned to an individual by any Federal or State government entity.

A "false identification card," not defined in the bill, is intended to include apparent identification cards which seem to have been issued by a government authority, even though that authority may not issue an identification card of that particular type. For instance, testimony before the subcommittee suggests that many producers of false identification are manufacturing documents that appear to be issued by a state. Such a document could be found to be a "false identification document" for purposes of the Act because it appears to be a government-issued document, even though it may not be a counterfeit of a document actually issued by that state.

Production without lawful authority is basically a counterfeiting offense. Production has been defined to include the terms alter, authenticate or assemble, but is not limited to those terms. Production therefore includes the forgery of an otherwise lawfully issued document by changing it without lawful authority. It also includes making, manufacturing, issuing, and publishing.

A government employee whose duty is to simply issue identification documents, and does not manufacture or assemble the documents, is, by issuing the document, authenticating it. If such an employee were to authenticate such documents without lawful authority, it would constitute an offense under this subsection.

3527

A knowing state of mind with respect to an element of the offense is (1) an awareness of the nature of one's conduct, and (2) an awareness of or a firm belief in the existence of a relevant circumstance such as whether an identification document had been stolen before it was transferred. For example, in the first offense, proof of a guilty *mens rea* requires proof not only that the defendant was aware that he was producing a document, but proof that he was aware that he was without lawful authority to produce such a document. The Committee intends that the knowing state of mind requirement may be satisfied by proof that the actor was aware of a high probability of the existence of the circumstance, although a defense should succeed if it is proven that the actor actually believed that the circumstance did not exist after taking reasonable steps to warrant such belief. This follows the practice of the Model Penal Code (section 2.02(7)). This approach deals with the situation

[page 10]

that has been called "willful blindness," the case of the actor who is aware of the probable existence of a material fact but does not satisfy himself that it does not in fact exist. Willful blindness would require an awareness of a high probability of the existence of the circumstance. *United States* v. *Jewell,* 532 F.2d 697, 700 n. 7 (9th Cir.), *cert. denied,* 426 U.S. 951 (1976).

The Committee intends that the term "with the intent" have the same culpable state of mind as the term "purpose" as used in the Model Penal Code (§ 2.02). The distinction from a knowing state of mind was recently re-stated by Justice Rehnquist, "As we pointed out in *United States* v. *United States Gypsum Co.,* 438 U.S. 422, 445 (1978), a person who causes a particular result is said to act purposefully if " 'he consciously desires that result, whatever the likelihood of that result happening from his conduct,' " while he is said to act knowingly if he is aware " 'that that result is practically certain to follow from his conduct, whatever his desire may be as to that result" ' " *United States* v. *Bailey,* 444 U.S. 394, 404 (1980).

The term "lawful authority" refers to the authority to manufacture, prepare, or issue identification documents by statute or regulation, or by contract pursuant to such authority. A person, such as a clerk, who is authorized to issue identification documents upon the satisfaction of certain requirements, could be acting without lawful authority if he issued an identification document knowing that the requirements had not been fulfilled. Similarly, a party printing identification documents under authorized contract could be producing without lawful authority if he delivered an identification document to any party other than an authorized recipient.

The second offense is the knowing transfer of an identification document or false identification document knowing that such document was stolen or produced without lawful authority. This offense covers those who traffic in stolen or false identification, irrespective of whether consideration was received. For instance, a member of a terrorist group who supplied false documents to other members of that group could be guilty of an offense under this subsection. Proof of this offense requires evidence that the defendant knew or had reason to believe that the document being transferred had been stolen or produced without lawful authority. "Stolen"

Case 1:08-cr-00004    Document 111-2    Filed 05/06/2008    Page 40 of 89

documents include those obtained by fraudulent means, as well as by theft.

The third offense is the knowing possession with the intent to use or transfer unlawfully five or more identification documents (other than those issued lawfully for the use of the possessor) or false identification documents. The offense requires that the possessor's awareness of the character of the identification documents reach the level of "knowing". Although some offenses distinguish between "receipt" and "possession" (e.g., 18 U.S.C. App. 1202(a)), the Committee intends that "possession" as it is used in subsections (a)(3), (4), and (5) include "receipt" as well.

The intent to use unlawfully is the intent to use (i.e., present, display, certify, or otherwise give currency to) the identification document in any manner so that it would be accepted as identification in a manner that violates a federal, state or local law, or is part of the making of a misrepresentation that violates a law. For

1. 98 S.Ct. 2864, 57 L.Ed.2d 854.
2. 99 S.Ct. 1497, 59 L.Ed.2d 575.

[page 11]

example, this subsection would be violated if the possessor intended to use the documents to make misrepresentations in any matter within the jurisdiction of any department or agency of the United States in violation of § 1001 of title 18, United States Code.

The intent to transfer unlawfully is the intent to sell, pledge, distribute, give, loan or otherwise transfer an identification in a manner forbidden by federal, state or local law. For example, it is an offense for a person to allow any other person to have or use any naval, military, or official pass or permit issued by or under the authority of the United States, issued for his use alone (18 U.S.C. 499). The possession of five or more identification documents with the intent to transfer the documents in violation of that section would be a violation of this subsection.

The fourth offense created is the knowing possession of an identification document (other than one issued lawfully for the use of this possessor) or a false identification document, with the intent such document be used to defraud the United States. One must know the character of the identification document that is possessed. The Committee intends that possession with the intent to commit any offense that would be subsumed under the term "defraud the United States" would be covered. It is the view of the Committee that the intent to defraud the United States in this context is an intent to use the identification document to commit an offense against the United States, for example, an offense under 18 U.S.C. 1001. The term "defraud the United States" is not simply a misrepresentation as the term "fraud" is often defined in recent legislative proposals, e.g., Criminal Code Revision Act of 1980 (96th Congress, 2d Session, H.R. 6915, H. Report 96-1396, 14, 141-143), but would include use of false identification to obstruct functions of the government.

The fifth offense applies to the knowing production, transfer, or possession of a document-making implement with the intent that such implement will be used in the production of a false identification document or another document-making implement which will

3529

be so used. A document-making implement, defined in subsection (d)(3), means any implement or impression specially designed or primarily used for making an identification document, a false identification document, or another document-making implement. An example of a document-making implement is a device specially designed or primarily used to produce a small photograph and assemble laminated identification cards. The term may also include any official seals or signatures, or text in a distinctive type face and layout that when reproduced are part of an identification document. In cases in which specialized paper or ink or other materials are used in the production of an identification document, those items would be document-making implements.

By confining "document-making implements" to those "specially designed or primarily used for" making identification and false identification documents, the Committee intends to exclude implements such as office photocopying machines, which are designed for more general and legitimate purposes. To the extent such a machine is used in the production of documents, the conduct will be covered under the generic production offense. To the extent such a machine is provided to another with the agreement that it is to be

[page 12]

used in the production of the false identification documents, the actor may be guilty of conspiracy to commit a production offense under 18 U.S.C. 371.

To prove this offense it is necessary to prove that the possessor was aware of the nature of the implement, and its capacity to be used in making identification documents, and that the possessor intended that it be used at any time or by any person to make false identification documents. An alternative prohibited intent is that the possessor intended that the primary implement be used to create other secondary document-making implements, for example, using a printing plate to produce another plate. The defendant's state of mind with respect to the intended use by the second party must be shown to be "knowing," which includes actual awareness, reasonable belief, or willful blindness. It is not required that the producer or possessor of the document-making implement have a specific intent that a second party use the primary document-making implement.

An attempt to commit any of the offenses under this section would also be an offense.

Subsection (b) sets forth the penalties for the offenses. There are three levels of penalties which depend upon the type of document, and the particular conduct proven to have occurred.

There are three most serious offenses, which carry a maximum fine of not more than $25,000 or imprisonment for not more than five years or both.

First if the unlawful production or transfer of identification documents or false identification documents that are of the most important type—(a) documents issued by or under the authority of the United States, and (b) birth certificates, driver's licenses or personal identification cards. Attempts to produce or transfer such documents would be punished similarly.

3530

# FALSE IDENTIFICATION
P.L. 97-398

In 1979 the National Committee on Uniform Traffic Laws and Ordinances, authors of the Uniform Vehicle Code, provided for the issuance of identification cards for nondrivers and restrictions on the unlawful use of such cards. A "personal identification card" is "a document issued by the department [of motor vehicles] for the sole purpose of identifying the bearer and not authorized for use as a driver's license". (Uniform Vehicle Code § 1–144.1).[3]

The second category of most serious offenses is the unlawful production or transfer of more than five identification documents or false identification documents. The committee believes that proof of production or transfer of this number of identification documents indicates that the offender is in the business of supplying false identification documents. One of the principal purposes of the Committee was to deter those who have engaged in this business.

---

[3] The National Committee on Uniform Traffic Laws Ordinances relied upon the recommendation of the Federal Advisory Committee on False Identification (FACFI) that the driver's license be established as the prime identification document to be used by individuals in transactions with businesses and governments.

The staff report of the Subcommittee on Operations of the National Committee on Uniform Traffic Laws and Ordinances (March 6, 1978) reported that at least 35 jurisdictions issued personal identification cards. In 32 states the personal identification cards are issued by the state driver licensing agency. "The personal identification card shall have substantially the same content as a driver's license, but shall clearly indicate that it is not a driver's license." (Uniform Vehicle Code § 6–105–1).

[page 13]

The Committee also felt it appropriate to punish severely those who transfer large qualities of documents, even if there is no consideration involved, because of the increased dangers posed by multiple transfers. Attempts to produce or transfer such documents would be punished similarly.

The final offense that carries the heaviest penalty is the offense of knowingly producing, transferring or possessing a document-making implement with the intent that such document-making implement will be used in the production of a false identification document or another document-making implement which will be so used. This offense is also of the type that will apply in most cases to those who are in the business of making false identification or who are involved in multiple transfers. Attempts to commit these offenses would be punished similarly.

The second category of offenses is slightly less serious and carries a maximum sentence of a fine of $15,000 and a maximum imprisonment of not more than three years. The first class of offenses in this category is the production or transfer of any identification document or false identification document other than one described above. Attempts to produce or transfer such documents would be punished similarly. Second, the knowing possession of five or more identification documents (other than those issued lawfully for the use of the possessor) or false identification documents with the intent to use or transfer them unlawfully carries this felony penalty.

The Committee viewed the possession of five or more false identification documents with this type of intent as a very serious offense. If the five false identification documents identify the possessor and are possessed with an intent to use them, the inference can fairly be drawn that the possesser caused the false documents to be produced.

3531

If the false identification documents have been produced to identify persons other than the possessor, or are intended to identify other persons, then the inference can fairly be drawn that the possessor is trafficking in false identification and intends to transfer them to other persons.

The third category of offenses is knowingly possessing an identification document or false identification document with the intent to defraud the United States, which is a misdemeanor carrying a maximum penalty of one year imprisonment and/or a fine of $5,000. The Committee felt that mere possession offenses involving a small number of documents ought not to be treated as seriously as counterfeiting and trafficking offenses. In addition, the actual conduct of defrauding the United States is already covered in many specific sections of criminal law which carry felony penalties.

Subsection (c) sets forth the circumstances which provide for Federal jurisdiction over the conduct proscribed in subsection (a). It would not be necessary for the prosecution to prove the defendant's state of mind with respect to this circumstance.

The first circumstance applies to all identification documents or false identification documents that are or appear to be issued by or under the authority of the United States. In addition, this paragraph would apply to cases involving document-making implements that are designed or suited to make an identification document or

[page 14]

false identification document that is or appears to be issued by or under the authority of the United States.

The production of identification documents without lawful authority would be subject to the extraterritorial jurisdiction of the United States under the generally recognized "protective principle" of international law. This would apply to the documents made by or issued under the authority of the United States.

The second jurisdictional circumstance is that in which the offender possesses the identification document or false identification document with the intent that such document be used to defraud the United States.

The third jurisdictional circumstance is when the production, transfer, or possession prohibited by this section is in or affects interstate or foreign commerce, or the identification document, false identification document, or document-making implement is transported in the mail in the course of the production, transfer, or possession prohibited by this section.

This formulation is intended to provide broad Federal jurisdiction over violations of this section while recognizing that protection of state and local documents is primarily the responsibility of the issuing jurisdiction.

The record of the testimony presented at the hearings of the Subcommittee on Crime on this legislation, and the findings of the Federal Advisory Commission on False Identification however demonstrate that the counterfeiting and transfer of false identification documents frequently result in the shipment of documents across state lines.

The Committee has chosen to limit the jurisdiction to production, transfer or possession that "is in or affects interstate or foreign

commerce" because the Committee intends that a minimal nexus with interstate or foreign commerce be shown.

With respect to the similar jurisdictional language of "receives, possesses, or transports in commerce or affecting commerce" of any firearm (18 U.S.C. App. § 1202), the Supreme Court has held that there is "no indication that Congress intended to require any more than the minimal nexus that the firearm have been, at some time, in interstate commerce." *Scarborough* v. *United States*, 431 U.S. 563, 575[3] (1977). The Court's holding indicates that the prohibited possession need not be contemporaneous with the movement/in or effect on interstate commerce. *Ibid*

It is not necessary that the purpose of the prohibited act be to affect interstate commerce. *United States* v. *Daley*, 564 F.2d 645, 649 (2d Cir. 1977). For instance, a showing that false identification documents in the possession of the defendant traveled at some time in interstate commerce would be sufficient.

Subsection (d) sets forth the definitions of terms such as "identification document", "produce", "document-making implement", "personal identification card", and "State".

Subsection (e) provides that this section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a state, or a subdivision of a state, or of an intelligence agency of the United States. In addition, the section does not prohibit any activity authorized under title V of the Organized Crime Control Act of 1970

---

3.  97 S.Ct. 1962, 52 L.Ed.2d 582.

[page 15]

(18 U.S.C. note preceding 3481).[4] Title V is the basis of the Federal witness protection program administered by the U.S. Marshals Service in which persons who have cooperated with Federal prosecutors and who may be the subject of attempted retaliation by the defendant, are enabled to relocate and establish new identities for themselves.

The authorized production and transfer of documents by United States employees to protected persons would be excluded from coverage under H.R. 6946, as would the lawful use of these documents by the protected person himself. This subsection is intended to provide the immunity analogous to that afforded in 21 U.S.C. 885(d).

Section 3 of the bill amends the table of sections at the beginning of chapter 47 of title 18, United States Code.

## OVERSIGHT FINDINGS

The Committee makes no oversight findings with respect to this legislation.

In regard to clause 2(1)(3)(D) of rule XI of the Rules of the House of Representatives, no oversight findings have been submitted to the Committee by the Committee on Government Operations.

## NEW BUDGET AUTHORITY

In regard to clause 2(1)(3)(B) of rule XI of the Rules of the House of Representatives, H.R. 6946 creates no new budget authority or increased tax expenditures for the Federal Government.

3533

## INFLATIONARY IMPACT STATEMENT

Pursuant to clause 3(l)(4) of rule XI of the Rules of the House of Representatives, the Committee finds that the bill will have no foreseeable inflationary impact on prices or costs in the operation of the national economy.

---

⁴ Protected Facilities for Housing Government Witnesses. Pub. L. 91–452, Title V, §§ 501–504, Oct. 15, 1970, 84 Stat. 933, provided that:

"Sec. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.

"Sec. 502. The Attorney General of the United States is authorized to rent, purchase, modify, or remodel protected housing facilities and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy. Any person availing himself of an offer by the Attorney General determines the jeopardy may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues.

"Sec. 503. As used in this title, 'Government' means the United States, any State, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof. The offer of facilities to witnesses may be conditioned by the Attorney General upon reimbursement in whole or in part to the United States by any State or any political subdivision, or any department, agency, or instrumentality thereof of the cost of maintaining and protecting such witnesses.

[page 16]

## FEDERAL ADVISORY COMMITTEE ACT OF 1972

The Committee finds that this legislation does not create any new advisory committees within the meaning of the Federal Advisory Committee Act of 1972.

## COST ESTIMATE

In regard to clause 7 of rule XIII of the Rules of the House of Representatives, the Committee agrees with the cost estimate of the Congressional Budget Office and estimates that no additional cost to the government will be incurred as a result of enactment of this bill.

## CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., August 18, 1982.*

Hon. PETER W. RODINO, JR.,
*Chairman, Committee on the Judiciary,*
*Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has reviewed H.R. 6946, the False Identification Crime Control Act of 1982, as ordered reported by the House Committee on the Judiciary, August 10, 1982.

The bill amends Title 18, United States Code, to provide penalties for certain crimes related to the possession, production, transfer or sale of false identification documents. Based on information

3534

Case 1:08-cr-00004     Document 111-2     Filed 05/06/2008     Page 46 of 89

provided by the Department of Justice, it is expected that no significant additional cost to the federal government would be incurred as a result of enactment of this legislation.

Should the Committee so desire, we would be pleased to provide further details on this estimate.

Sincerely,

RAYMOND C. SCHEPPACH
(For Alice M. Rivlin, Director).

\* \* \* \* \*

[page 19]

## ADDITIONAL VIEWS OF ROBERT W. KASTENMEIER

Although I fully appreciate the problems arising from the use of false identification, as demonstrated by the hearings before the Subcommittee on Crime, and support the passage of legislation to address these problems, I am constrained to express concern regarding certain aspects of H.R. 6946 as reported by the Judiciary Committee. For the reasons expressed below, I believe that proposed 18 U.S.C. 1028(a)(4), prohibiting possession of false identification with intent to defraud the United States, is both unnecessary and unwise and should be omitted from the legislation.

There is a disturbing tendency on the part of legislatures, and Congress in particular, to treat many problems as amenable to solution only through the criminal law. The result is a proliferation of new laws, sometimes drafted without the due attention to a potentially serious and detrimental impact on the criminal justice system.

In order to ensure that no aspect of a problem is left unaddressed, new criminal offenses are occasionally drafted broadly, without regard for the existence of laws already extant which prohibit the conduct in question. This multiplicity of laws produces a multiplicity of charges, each with slightly different elements and, therefore, differing proofs at trial. Increased complexity of trials and jury confusion are inevitable. This duplication of offenses can also unduly increase the power of the prosecution. Unfair pressure to seek a plea bargain is placed on a defendant facing multiple charges from a single alleged act of criminal conduct.

The broad drafting of these new laws can also lead to an expansion of Federal jurisdiction far beyond the original intent of Congress. For example, the Hobbs Act, 18 U.S.C. 1951, was originally enacted to deal with labor racketeering. Court interpretations, however, have looked to the broad language used, rather than to the Congressional intent, and have brought within the scope of the Hobbs Act virtually every commercial robbery or extortion. *See United States v Culbert*, 435 U.S. 371[1] (1978); H. Rep. 96-1396 at 290-91. The expansion of jursidiction is generally at the expense of the states, thus upsetting the Federal framework which has traditionally placed the enforcement of criminal laws in the province of the states.

3535

Another troubling consequence of the way in which we frequently respond to the need for a new criminal offense is the criminalization of increasing types of inchoate conduct. The proliferation of "possession" offenses is typical of this problem. By prohibiting the possession of objects which are not of themselves harmful, but only so if used for specific purposes, we may decrease the opportunity for a potential criminal to abandon the idea of criminal conduct. Moreover, although the "specific intent" requirement of many such offenses probably prevents the conviction of innocent possessors,

4. 98 S.Ct. 1112, 55 L.Ed.2d 349.

[page 20]

the same cannot be said regarding the possible arrest or prosecution of such persons. Because of the ease with which a possible cause requirement is satisfied, possession offenses are ripe with the potential for police and prosecutorial abuse. A typical example would be the arrest of a person carrying a screwdriver for possession of burglary tools, because he or she did not show proper respect to a law enforcement officer.

Unfortunately, proposed paragraph (4) of 18 U.S.C. 1028 is an example of an overly broad statute. As a possession offense, it criminalizes conduct long before an attempt to defraud the United States has occurred. The fraudulent use of the false identification—the real harm which the offense is designed to prevent, is almost certain to be covered by another Federal offense, either as a theft or as a false representation. See H. Rep. 96-1396 at 175-79, 305-11.

Finally, the phrase "intent to defraud" has already been interpreted very expansively. In the context of 18 U.S.C. 371, for example, it has been read to cover almost any interference with a Federal government function by dishonest means. See H. Rep. 96-1396 at 133-37. Thus, the use of such a potentially vague phrase in a possession offense is even more problematic.

Most of the problems which arise from the use of false identification are the proper concern of state government. Only when the use of such identification harms the Federal government or when the problem is of a multi-state nature should the Federal law become involved. The former case, I believe, is adequately addressed by various current Federal laws. Additional laws may well be necessary in the latter case, and for this reason, I support H.R. 6946. Proposed 18 U.S.C. 1028(a)(4), however, is necessary for neither situation, and for this reason I would urge its deletion from the legislation.

In conclusion, I urge my colleagues to favorably consider amendments that would delete those portions of the bill that create a new offense of possessing false identification with intent to defraud the Federal government. Sucn an offense is potentially overly broad, may ready too much inchoate conduct, and is unnecessary to meet a legitimate Federal concern.

ROBERT W. KASTENMEIER.

Case 1:08-cr-00004    Document 111-2    Filed 05/06/2008    Page 48 of 89

FD-302 (Rev. 10-6-95)

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/08/2005

        LEE, INA, EUN YOUNG, Date of Birth (DOB) 08/22/1971, Social Security Account Number (SSAN) 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, who resides at #151 W. Malatg Street Hyundai, Mongmong, Guam, and whose cell phone number is (671) 688-2506, was interviewed at the Guam Resident Agency. Lee was advised that she was free to leave anytime. After being advised of the identity of the interviewing agents and the nature of the interview, LEE provided the following information:

        LEE is employed by CONTINENTAL AIRLINES at GUAM INTERNATIONAL AIRPORT where she works the "graveyard shift" and earns $11.75/hour.

        LEE also works for the GOVERNMENT OF GUAM as a translator/interpreter and administers the written driver's test for the GUAM MOTOR VEHICLE DIVISION at the UNIVERSITY OF GUAM.

        LEE initially denied that she had received any money to illegally sell driver's licences. LEE later admitted that she may have received several hundred dollars from people that she had helped. LEE specifically denied having accepted $1,000 to secure the issuance of two Guam driver's licenses. However, when LEE was shown a photograph of her accepting $1,000, she confessed that she did indeed receive the money to procure Guam driver's licenses for two individuals. LEE finally admitted that she had helped approximately 20 individuals illegally obtain Guam driver's licences. LEE normally charged these buyers $800 per license.

        A Social Security Number or Individual Taxpayer Identification Number (ITIN) is required in order to obtain a Guam driver's license. At first, LEE tried submitting official paperwork in order to get ITINs. However, after her application(s) were rejected, she started fabricating her own ITIN letters. LEE accomplished this by whiting-out information on an old INTERNAL REVENUE SERVICE ITIN letter, entering new information and then photocopying the letter. LEE admitted to forging approximately 20 ITIN letters.

        Lee initially denied that she provided the answers to the written driving test to her clients. LEE later admitted that she gave her clients the answers to the written test.

---

| | | |
|---|---|---|
| Investigation on | 11/08/2005 | at Mongmong, Guam |

File # 194B-HN-18383        Date dictated

SA J. Alexander Ferguson:jaf

by   SA William C. Hoffman

GOVERNMENT
EXHIBIT
16

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

05 INVEST 00047

194B-HN-18383

Continuation of FD-302 of ___Ina Lee_____ , On 11/08/2005 , Page ___2___

       LEE is not paying anyone at GUAM MOTOR VEHICLE DIVISION (GMVD) to help her secure Guam driver's licenses.  LEE has befriended many GMVD employees by making Korean food for them and attending rosaries and the like.  The GMVD employees, in turn, help LEE by just accepting her client's documents without scrutinizing them.  They do this for her because they know her.  LEE is not bringing her customers to any one specific employee at GMVD.

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/31/2007

INA EUNYOUNG LEE, also known as Eun Young LEE, date of birth August 22, 1971, United States passport number 121225094, residing at 892 B St. John Street, Upper Tumon, Guam, was interviewed at GUAM INTERNATIONAL AIRPORT subsequent to her arrest. LEE was advised of her rights as provided on an FD-395, Advice of Rights form, acknowledged that she understood her rights and waived them by signing the Waiver of Rights portion of the FD-395. At approximately 2:40 a.m., LEE was transported to FEDERAL BUREAU OF INVESTIGATION office, Guam RA, where the interview resumed. LEE was reminded that her rights still applied. After being advised of the identity of the interviewing agents and the purpose of the interview, LEE provided the following information:

LEE has provided help to Koreans seeking Guam driver's licenses. LEE said the people she helped were friends, students and mostly golfers. She added that she never helped any Korean women that were working at the local Karaoke bars. All but a couple of these individuals were overstays. The two that weren't overstays were students. Between 2001 and 2003, LEE assisted approximately thirty to forty Koreans with legitimately obtaining their licenses. LEE became involved in assisting Koreans in obtaining their driver's licenses at the request of KEUN, LEE (KEUN). Koreans on Guam needed driver's license to golf and KEUN, who was on Guam at the time, asked LEE for her assistance. KEUN now lives in South Korea as a semi-professional golfer.

One of these steps included applying for an Individual Taxpayer Identification Number (ITIN) in the Korean applicant's name. In or around 2003, the INTERNAL REVENUE SERVICE (IRS) began denying these applications for individuals seeking ITINs for identification purposes.

Once the IRS began denying LEE's submitted ITINs, LEE began creating the documents fraudulently. LEE copied an original ITIN document issued in 2003 and "whited out" the name, date of birth, and ITIN. LEE would then type over the whited out portion with information of the applicant, including a false ITIN. LEE estimates she did this approximately twenty to twenty five times. Every applicant that LEE assisted would be provided an ITIN document, either legitimate or fraudulent. LEE never provided an ITIN number on a GUAM MOTOR VEHICLES DIVISION driver's license

Investigation on    12/24/2007    at   Tamuning, Guam

e #  194A-HN-18383                           Date dictated   not dictated

SA William C. Kline, Jr.:wck
by  SA Kenneth R. Klocke

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GOVERNMENT
EXHIBIT
17

Continuation of FD-302 of ___Ina Eunyoung LEE_____ , On _12/24/2007_ , Page ___2___

application without supporting documentation. All of the applicant's were provided with the ITIN document after their license applications were submitted. The last time LEE falsified an ITIN document was at the end of 2004.

LEE knows the applicants that she assisted knew they were not entitled to a Guam driver's license. There would be no reason to used LEE otherwise. Some applicants knew specifically what was being done was illegal and others LEE told that this was not the right way to obtain a license. No applicant specifically questioned her methodology. Once LEE presented the applicant with a fraudulent ITIN, she told everyone that the document was fake or not a good one. With regards to the Guam driver's license applications that LEE completed in her hand, LEE provided all of the ITINs for those, whether they were legitimate or fraudulent.

LEE charged most individuals three hundred dollars for her services. She would charge more if the applicant was required to take driving school. In that case, LEE charged three hundred and fifty dollars more and gave that additional money to WILLIAM LIMTIACO, owner of WHEELS DRIVING SCHOOL (WHEELS). In turn, LIMTIACO would issue the applicants their certificates without teaching the students anything. LEE refereed all of her business to WHEELS. LEE added that she went to high school with LIMTIACO and that is how they knew each other.

With regards to LEE's fee, she added that some applicants gave her more money than requested. For example, LEE, KIL JA (K J LEE) paid LEE one thousand dollars. LEE said this was an example of the fact that Koreans really wanted her assistance and begged her for her help. LEE and K J LEE's children took piano lessons together.

LEE would accompany most of the applicants into the GUAM MOTOR VEHICLE DIVISION but not all. On occasion an applicant would go in by themselves to GMVD and some would get rejected because their ITIN was a copy. LEE would then go in with this applicant at a later date and submit the documents with the applicant. LEE said she was turned down by all of the examiners on at least one occasion. LEE said some of the occasions occurred because LEE used a xeroxed copy of a more recent ITIN document. The more recent documents, dated after 2003, say "VOID" when copied. These copies were always denied by examiners.

194A-HN-18383

Continuation of FD-302 of     Ina Eunyoung LEE                              , On 12/24/2007  , Page    3

    LEE does not believe the MVD examiners knew the fraudulent ITIN documents she was presenting or had created were fake. LEE didn't favor going to any certain examiner and would go to whomever was available. LEE never paid any of the examiners any money, or gave them anything, to accept fake ITINs. LEE doesn't consider any of the examiners friends and has never called any of them on the telephone. LEE did provide kimchee to a MVD examiner's relative's rosary approximately ten years ago. LEE wasn't sure but believes the supervisor of the driver's licensing section of MVD is a short man, FIRST NAME UNKNOWN BORJA.

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/15/2008

     Pursuant to the issuance an arrest warrant from UNITED STATES DISTRICT COURT, DISTRICT OF GUAM, Ina Eunyoung LEE was arrested at GUAM INTERNATIONAL AIRPORT on December 24, 2007. Lee was advised of her rights as provided on an FD-395, Advice of Rights form, acknowledged that she understood her rights and waived them by signing the Waiver of Rights portion of the FD-395. At approximately 2:40 a.m., LEE was transported to the FEDERAL BUREAU OF INVESTIGATION (FBI) office, Guam RA, where the interview resumed. LEE was reminded that her rights still applied. After being advised of the identity of the interviewing agents, FBI Special Agents (SA) William C. Kline, Jr. and Kenneth R. Klocke, and the purpose of the interview, LEE provided the following information:

     LEE was show several photocopied Applications for Guam Driver's License forms. LEE was asked to view these copies and mark with a highlighter pen any handwriting that is LEE's. LEE was advised that some forms may not have any handwriting that belongs to LEE and that the original application could be made available if LEE was unable to make a determination from the photocopy. LEE stated she understood and marked and initialed the following photocopied applications as those which bear her handwriting:

LEE, Ji Eon
KANG, Sung Hun
BANG, Keun Seok
HAM, Jeong Min
HONG, Dong Pyo
HWANG, Jong Yeon
HAN, Sung Jun
PARK, Sang Jin
LEE, Jae Min
KIM, Ha Young
HONG, Sung Kyu
CHO, In Hwan
KOH, Won Il
KIM, Mi Jung
KIM, Sang Ho
LEE, Tong Hun
KANG, Dongmi
JUNG, Dong Sik
KANG, Hyuk Su

*07 INVEST 00 102*

---

Investigation on   12/24/2007   at   Maite, Guam

c # 194A-HN-18383      Date dictated   not dictated

SA William C. Kline, Jr.:wck
by   SA Kenneth R. Klocke

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



GOVERNMENT EXHIBIT
*18*

194A-HN-18383

Continuation of FD-302 of ____Ina Eunyoung LEE_____, On 12/24/2007 , Page __2__

MIN, Jun Sung
RYU, Sang Chul
CHAE, Jung Il
CHO, Chun Ja
LEE, Haeng Hwa
LEE, Young Hee
KIM, Ok Sun
BAEK, Kyoung Hwa
KIM, Mi Ra
LEE, Geun Jae
CHUN, Sang Mee
CHOI, Seung Pill
SEOK, Jae Hoan
KIM, You Soon
CHOI, Tae Sung
CHOI, Deuk Soon
YANG, Jung Soo
PARK, Jum Soo

     LEE marked the following applications stating that they did not contain her handwriting:

KIM, Young Nam
KANG, Hae Sook
OH, Jung Ja

     All of the above-referenced applications were witnessed and signed by Special Agents William C. Kline, Jr. and Kenneth R. Klocke. These applications are being maintained in 1B5.

FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription  06/21/2007

MARCELINO J. LASERNA, date of birth October 27, 1947, Social Security account number 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, was interviewed at the FEDERAL BUREAU OF INVESTIGATION office, Guam Resident Agency, 400 Route 8, Suite 402, Maite, Guam 96910. LASERNA resides at 228 B. Pas Street, Tamuning, Guam and his family cellular telephone number is 671-787-4630. After being advised of the purpose of the interview, the identity of the interviewing agents and admonished that he was providing information voluntarily and free to leave at any time, LASERNA provided the following information:

LASERNA was born in the Philippines and settled on Guam in 1973. LASERNA has been employed by the GUAM MOTOR VEHICLE DIVISION for the past seven years as a driver's license examiner. LASERNA processes driver's license applications, does applicant eye exams, takes photographs that appear on the licenses and also does training in road testing. He hasn't worked in road testing for two months because of a manpower shortage.

LASERNA's first supervisor was DOLORES "DEE" MESA, who retired approximately one year ago. MESA was replaced by JESSE SALAS who is LASERNA's current direct supervisor. LASERNA never received any training that he would consider formal. He learned how to perform his various tasks by on the job training and occasional training meetings. These training meetings would be held for various topics such as off-island license procedures or procedures on dealing with expired licenses. LASERNA was never assigned or had anyone that he considers a mentor or training employee. LASERNA would later say he also takes direction on how to perform his job by memorandums circulated by GMVD administration.

If a foreign national living on Guam wanted to obtain a Guam driver's license, that person would have to obtain translation of their foreign driver's license from their respective consulate which certified that the individual possessed a valid driver's license from that country. The individual would also have to present their passport and either a card bearing their Social Security Account Number (SSAN), a certification letter from the Social Security Administration office stating that person had a valid SSAN or an Individual Taxpayer Identification Number (ITIN). If that person applied for both an SSAN and an ITIN and was

---

Investigation on  06/21/2007  at  Maite, Guam

00 218

File # 194A-HN-18383

by  SA William C. Kline, Jr.:wck
    SA J. Alexander Ferguson

Date dictated  06/21/2007

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GOVERNMENT
EXHIBIT
19


rejected for both, they could submit those rejection letters to GMVD and receive a provisional, one year license. The process outlined above applied to Korean and Japanese individuals. Chinese seeking Guam driver's licenses are allowed to present a translation document from RICHARD LOO (phonetic spelling), owner of EASTERN DRIVING SCHOOL validating that Chinese driver's license. According to LASERNA, LOO brings many Chinese individuals into GMVD and assists them with obtaining Guam driver's licenses. LOO brings in so many Chinese to GMVD at a time that it is a joke among examiners that the "boat" has arrived when all of these individuals arrive together. LASERNA said there are no individuals, that he knows of, that offers assistance like LOO does, no one for the Koreans, Japanese or Filipinos. LASERNA said these individuals can request a foreign written test if they do not speak English.

LASERNA described a valid ITIN as either a card, which is the same size as a SSAN card, bearing green ink with the ITIN, individual's name and signature or a letter, on the INTERNAL REVENUE SERVICE letterhead issued from Philadephia, Pennsylvania, bearing the same information. LASERNA stated the older style ITIN letter had the card attached but was unsure on whether the card was perforated or just marked with hashes for cutting. The older style ITIN letter is on "bond" paper, which LASERNA described as thinner than Xerox paper and black and white. LASERNA has accepted both letters with the card attached and those without. LASERNA stated it has been a long time since he has seen these older style letters as in recent years, the IRS is only issuing letters without cards. LASERNA was directed by SALAS, which he believes coincided with a memorandum from the GMVD Director, to accept either the letter or the card.

LASERNA has never been presented with a fraudulent document. If he would, he has been instructed to report that incident to his supervisor. He knows of no instance where GMVD examiners have been presented with fraudulent documents.

LASERNA always asks to see all of the applicant's required documents, with one exception. LASERNA will allow an individual to obtain a duplicate driver's license if he has known the person over a period of time and that person is not negatively flagged in the GMVD database.

LASERNA stated he does know INA LEE. He didn't mention her earlier as a person who assists Koreans because he could not remember her name. LEE is employed as a stewardess for CONTINENTAL




AIRLINES. He is not aware of her employment history with GMVD. He last saw LEE approximately two months ago when LEE came into GMVD. LASERNA is unaware of LEE's reason for coming to GMVD and did not know if she was alone or with someone. The two said hello to each other while LASERNA was working the camera. When the GMVD office located in Tiyan, LEE came in to the office once a week for approximately three years. LEE would rarely come alone, usually she would be accompanying two or three Koreans seeking Guam driver's licenses.

LASERNA estimated that he waited on LEE and her clients about ten to twelve times. He couldn't explain why he handles a large number of LEE's client's applications when he had advised earlier that he is usually assigned to work the camera. LASERNA said other examiners assisted LEE as well, such as MARY GARCIA and FRANK KAWAMOTO. GARCIA and SALAS know LEE well but LASERNA could not elaborate on those relationships. LASERNA believes GARCIA waited on LEE and her clients a lot and was told by GARCIA that LEE charges her clients money for her services. LASERNA has never received anything from LEE, including money or food, and has never dealt with her in a social setting. The two have probably spoken on the telephone, but just to see if her clients passed the written examination. LASERNA advised that many people call in to check examination scores, especially parents of minors.

LEE knows SALAS because SALAS has probably waited on her at the counter. LASERNA knows of no special relationship between the two and has never been asked by SALAS to provide preferential treatment to LEE or her clients. LASERNA does not believe LEE knows FRANK BLAZ or ART ILAGAN. BLAZ and ILAGAN are members of the GMVD administration.

When asked why he would allow LEE to present him an ITIN letter, with card attached, that was completely black and white, LASERNA stated that he believed the documents he viewed were legitimate documents. LASERNA said he verifies documents by using the security features but couldn't explain what specific features he was referring to. LASERNA could not explain how a black and white letter, with card attached, could be considered a valid document when he earlier stated that valid ITIN cards contain green ink. When asked if he was color blind, LASERNA said sometimes. He was then asked to name the color on a green and white box behind him, which he described as green. LASERNA later admitted that he accepted the older style xeroxed ITIN letters from LEE because she told him she had left the originals at home.

194A-HN-18383

Continuation of FD-302 of ___Marcelino J. LASERNA_____ , On 06/21/2007 , Page 4

LASERNA estimates that LEE provided him with more xeroxed copies
than she did originals.  LASERNA believes those were mixed
throughout the span of time and it was not as though LEE provided
all originals at first and then went only to xeroxed copies.
LASERNA said he stopped accepting xeroxed copies of ITIN letters
from LEE when a memorandum from the GMVD Director advised examiners
not to accept anything but original documents.  LASERNA did not
remember when that memorandum was published.

FD-302 (Rev 10-6-95)

LASERNA
1/9/08

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/14/2008

       Marcelino J. LASERNA, date of birth October 27, 1947, social security account number 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, residing at 228 B. Pas Street, Tamuning, Guam, family cellular telephone number 671-787-4630, was interviewed at the UNITED STATES DISTRICT COURTHOUSE, DISTRICT OF GUAM, Hagatna, Guam by FEDERAL BUREAU OF INVESTIGATION Special Agent William C. Kline, Jr. and UNITED STATES POSTAL INSPECTION SERVICE, Postal Inspector Steve Basak. After being advised of the identity of the interviewing agents, purpose of the interview and that LASERNA was free to leave at any time, LASERNA provided the following information:

       LASERNA stated that he wanted to clarify something that had come up in an earlier interview. When LASERNA was first presented with photocopied INDIVIDUAL TAXPAYER IDENTIFICATION NUMBER documents, he asked Mary GARCIA, a senior MOTOR VEHICLE DIVISION (MVD), Driver's License examiner what to do. GARCIA told LASERNA to accept the photocopy and tell the applicant to bring in the original next time. LASERNA thought this was bad advice as it was contrary to MVD policy to only accept original documents but he took GARCIA's advice because she was senior to him. LASERNA never asked the opinion of the supervisor and/or other co-workers after the fact.

---

Investigation on    01/09/2008    at   Hagatna, Guam

e #   194A-HN-18383        Date dictated   not dictated

by    SA William C. Kline, Jr.:wck

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GOVERNMENT
EXHIBIT

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/17/2008

Marcelino J. LASERNA, date of birth October 27, 1947, social security account number 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, residing at 228 B. Pas Street, Tamuning, Guam, family cellular telephone number 671-787-4630, was interviewed at the UNITED STATES DISTRICT COURTHOUSE, DISTRICT OF GUAM, Hagatna, Guam by FEDERAL BUREAU OF INVESTIGATION Special Agent William C. Kline, Jr. and UNITED STATES POSTAL INSPECTION SERVICE, Postal Inspector Steve Basak. After being advised of the identity of the interviewing agents, purpose fo the interview and that LASERNA was free to leave at any time, LASERNA provided the following information:

LASERNA was shown photocopies of Guam Driver's license applications and asked to mark all of his handwriting, if any, that appeared on the following applications:

SHIN, Sung Min
HAN, Ki Cheol
YANG, Jung Soo
KO, Young Min
LEE, Geun Jae
CHOI, Seung Pill
HONG, Dong Pyo
KIM, Mi Ra
CHOI, Deuk Soon
CHO, Chun Ja
HWANG, Jong Yeon
MIN, Jun Sung
KANG, Hae Sook
LEE, Jae Min
JUNG, Tae Kwun
KOH, Won Il
CHO, In Hwan
KANG, Hyuk Su
KIM, Myung Sug
SEOK, Jae Hoan
KIM, Tae Ho
PARK, Hak Ja
HONG, Sung Kyu

Investigation on    01/09/2008    at  Hagatna, Guam

File # 194A-HN-18383                                      Date dictated   not dictated

by   SA William C. Kline, Jr.:wck

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is it and its contents are not to be distributed outside your agency.

GOVERNMENT
EXHIBIT
36



194A-HN-18383

Continuation of FD-302 of ___Marcelino J. LASERNA_____ , On __01/09/2008__ , Page ___2___

      LASERNA marked his handwriting on each application by underlining in pen. In his own hand, LASERNA wrote, signed, and dated the following statement:

      I underlined the copy of my handwriting on application that I process on written exam.

      The interview is memorialized on a separate FD-302. The above-referenced applications are being maintained as evidence.

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription     02/01/2008

MARCELINO JEREOS LASERNA, Pacific Island male, born October 27, 1947, place of birth Philippines, Social Security Account Number 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, Examiner, Guam Department of Motor Vehicles (DMV), was interviewed at the Guam Resident Agency of the Federal Bureau of Investigation.  After being advised of the identity of the interviewing agents and the purpose of the interview and of his rights, LASERNA provided the following information:

LASERNA became a United States citizen in 1978.  He has been employed at DMV for 7 years.  Prior to his employment at DMV, he was employed at Guam Rehab and he left Guam Rehab because it was privatized, then he moved to Public Works and then to DMV.  He has eighteen (18) years of service with the Government of Guam.

LASERNA was provided a copy of an FD-302 dated January 9, 2008.  LASERNA read the FD-302 and wrote on the document " I read this document & its true & correct.  LASERNA signed the document.

On one occasion, LASERNA asked MARY GARCIA, former Senior Examiner, DMV, about taking copies of Individual Tax Identification Number (ITIN) documents from driver's licence applicants.  GARCIA told him that he could accept copies of the ITINs.  He took ITIN copies from INA LEE as LEE brought Koreans Nationals into the DMV to obtain Guam Driver's Licences.  LEE was in possession of the ITINs, which were not in envelopes and LEE gave the applicant's documents to LASERNA.

GARCIA told him that it as okay to take copies of documents from LEE.  The copies looked like letters, with no ITIN cards on the documents.  GARCIA was the only Examiner he spoke with regarding accepting copies of ITINs from LEE.

He received ITINs from the Government of Guam.  Those ITINs were original ITINs and signed by ART ILAGAN.  He was aware that the original ITIN letters from the Internal Revenue Service had cards attached (part of card had green ink), with perforations around the cards and he was aware that the Internal Revenue Service stopped issuing ITIN cards.  He saw approximately ten ITIN letters with cards (copies), but saw more ITIN letters (copies) without cards.

Investigation on   01/25/2008   at  Mongmong, Guam

194A-HN-18383

SA Kenneth R. Klocke: krk
by  SA William C. Kline, Jr.

Date dictated  02/01/2008

GOVERNMENT EXHIBIT
22

Case 1:08-cr-00004     Document 111-2     Filed 05/06/2008     Page 63 of 89



194A-HN-18383

Continuation of FD-302 of __Marcelino Jereos Laserna_____ , On 01/25/2008 , Page ___2___

He thought he received original ITINs at DMV in 2004 and 2005.

When LEE brought Korean Nationals to LASERNA's Examiner window, LEE told him, about 5 or 6 times, that the original ITINs were at the house. LASERNA then advised that every time that LEE brought in ITINs she said the originals were left at home. LEE was the only person who presented copies of ITINs at DMV and all copies were accepted. He does not recall rejecting any Korean Nationals because of copied ITINs.

Anyone other than LEE who came into DMV to obtain a Guam Driver's Licence, without an original ITIN document, he would have been rejected and they would not have accepted the driver's licence application. He would not accept an excuse that the original ITIN was at home from anyone other than LEE. Others presented photo copies of documents and he did not accepted them.

He knew other Examiners were accepting copies of ITINs from LEE. He saw other Examiners receive copies from LEE. He was aware that on an original ITIN letterhead, the words Internal Revenue Service, Department of the Treasury, on the left side of the letter, were in colored ink.

He allowed LEE to utilize copies of ITINs to obtain Guam Driver's Licences because he was following other Examiners at DMV.

LASERNA let LEE provide copies of ITINs because he wanted to get along with the other examiners and so he would not have problems at DMV, regarding his employment. He thinks all the other examiners knew what original ITINs looked like, he was positive, because they saw original ITINs from customers who came into DMV. He is sure that from 2004 - 2005 that everyone (all the Examiners) would have seen original ITINs.

He did not know that LEE was paid to obtain the driver's licenses for the Korean Nationals, but he thought that she was paid.

He knew that the Korean Nationals were not suppose to receive a Guam Driver's Licence because they did not have original ITINs.

194A-HN-18383

Continuation of FD-302 of ___Marcelino Jereos Laserna___ , On _01/25/2008_ , Page __3__

After he received the applications, he entered the
information into the AS-400 DMV Guam Driver's Licence computer
system.

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    01/14/2008

    Marcelino J. LASERNA, date of birth October 27, 1947, social security account number 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, residing at 228 B. Pas Street, Tamuning, Guam, family cellular telephone number 671-787-4630, was interviewed at the UNITED STATES DISTRICT COURTHOUSE, DISTRICT OF GUAM, Hagatna, Guam by FEDERAL BUREAU OF INVESTIGATION Special Agent William C. Kline, Jr. and UNITED STATES POSTAL INSPECTION SERVICE, Postal Inspector Steve Basak. After being advised of the identity of the interviewing agents, purpose of the interview and that LASERNA was free to leave at any time, LASERNA provided the following information:

    LASERNA stated that he wanted to clarify something that had come up in an earlier interview. When LASERNA was first presented with photocopied INDIVIDUAL TAXPAYER IDENTIFICATION NUMBER documents, he asked Mary GARCIA, a senior MOTOR VEHICLE DIVISION (MVD), Driver's License examiner what to do. GARCIA told LASERNA to accept the photocopy and tell the applicant to bring in the original next time. LASERNA thought this was bad advice as it was contrary to MVD policy to only accept original documents but he took GARCIA's advice because she was senior to him. LASERNA never asked the opinion of the supervisor and/or other co-workers after the fact.

*I READ THIS DOCUMENT & ITS TRUE & CORRECT*

*[signature]*
*8:20 / 1-25-08*

*Sa [signature] FBI 1/25/08*
*SA [signature] FBI 1/25/08*

---

Investigation on    01/09/2008    at   Hagatna, Guam

File #   194A-HN-18383

Date dictated   not dictated

by   SA William C. Kline, Jr.:wck

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GOVERNMENT
EXHIBIT
23



FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription  01/30/2008

JOSEPH CRUZ PANGELINAN, Chamorro male, retired, Guam Department of Motor Vehicles (DMV), born August 3, 1945, place of birth Guam, Social Security Account Number 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, Guam Driver's License Number 1228010169, residing at 246 Lada Avenue, Dededo, Guam 96929, home telephone number (671) 637-4868, was interviewed at the United States Marshal's Office, Guam. After being advised of the identity of the interviewing agents and the purpose of the interview and after being advised of his rights and after waiving his rights, PANGELINAN provided the following information:

PANGELINAN was employed for 6 years as a DMV Examiner. He was employed from 2001 to 2006 and he retired on June 30, 2006. Prior to his employment with DMV, he was a civilian employee, Production Superintendent, for the Department of Defense.



PANGELINAN knew INA from INA coming into the DMV. He did not know INA's last name. She came into DMV about 2 to 3 times per week. He did not see anyone else in DMV as much as he saw INA. INA came to his Examiner window to translate for Korean driver's license applicants. She was always escorting Koreans to DMV. He did not know if INA was paid by the Korean applicants.

If the Korean applicants had a Korean driver's license issued to them for 5 years or more, the Korean applicants were not required to go to a driving school, like WHEELS. The 5 year requirement was a DMV policy.

To obtain a Guam driver's license, the Korean applicants were required to provide a Korean driver's license, Korean passport, tax identification number and the names must match.

Original documents were needed to obtain a Guam driver's license. The original Social Security Account card was blue and the original Individual Tax Identification Number (ITIN) card was blue. The ITIN letter had no color.

He did not know the DMV policy for accepting originals. No one told him that the ITIN had to be an original, but the driver's license applicants needed to have the original Social Security cards to obtain a driver's license. PANGELINAN would only

---

Investigation on  1/25/2008  at  Hagatna, Guam

File # 194A-HN-18383  Date dictated  1/30/2008

SA Kenneth R. Klocke:krk

by  SA William C. Kline, Jr.



GOVERNMENT EXHIBIT
24

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

462



194A-HN-18383

Continuation of FD-302 of ___Joseph Cruz Pangelinan___ , On 1/25/2008 , Page 2

accept original Social Security cards, Guam Identification Cards, citizen paperwork, driver's licenses and passports. JESS SALAS told him he needed to see original passports for applicants to obtain Guam driver's licenses. He did not know if documents from the Korean Consulate needed to be original.

ITINs were the only documents which copies could be excepted by the DMV. He knew the ITIN cards were in color.

PANGELINAN was provided a letter from the Department of Treasury, Internal Revenue Service, which SA KLOCKE labeled 1 and provided to PANGELINAN. PANGELINAN advised that even if the letter had names and numbers that were not marked-out he would have never accepted the document because it was bogus. He would not accept the document (1) because the area around the card was suppose to be perforated and the card (ITIN) was like a Social Security card.

PANGELINAN wrote on the face of the document (1) "I think it's blue," referring to the color of the ITIN card. On the back of the document (1), PANGELINAN wrote "As an examiner I I would not accept this document because I need the original. I annotated the ITIN for verification. I copy the ITIN no. from the letter." PANGELINAN initialed the document. He has never been presented a document at DMV which looked like this document (1).



SA KLOCKE provided PANGELINAN with a letter from the Department of Treasury, Internal Revenue Service, labeled 2. PANGELINAN initialed the face of the document (2). PANGELINAN advised he did not remember seeing letters like that at DMV. If he would have been presented a letter like this, he would have asked JOHN DUENAS, DMV Examiner, about it. Asking DUENAS had nothing to do with the letters/numbers being marked-out on the letter.

JOHN DUENAS told him that they were not going to issue any more ITIN cards. PANGELINAN never asked any co-workers at DMV if ITINs he received were valid. PANGELINAN never rejected anyone from receiving a Guam driver's license because the ITINs were not valid.

He advised that people could apply for an ITIN or obtain ITIN applications at the First Hawaiian Bank Building, 3rd Floor, Internal Revenue Office. He told people, who could not obtain a Social Security number, to go there. People could obtain a Guam driver's license with a denial letter from the Internal Revenue





194A-HN-18383

Continuation of FD-302 of ____Joseph Cruz Pangelinan____ , On _1/25/2008_ , Page ___3___

Service (ITIN) and a denial letter from the Social Security office. The driver's license was good for 1 year.

He did not know about other Examiners. No one directed him to process driver's license applications which INA brought into DMV and INA was not given preferential treatment at DMV. INA never offered him a gift and he never asked INA for anything. He did not receive any money from INA or any personal favors. He did not know why INA would have received preferential treatment at DMV.

The Korean people who came in DMV with INA gave INA the ITIN letters. The letters looked original. The ITINs were not in an envelope.

He did not allow people to obtain Guam driver's license who were not suppose to receive them. He terminated many people on the road test. He was referred to as the terminator by others. No one told him the ITINs on the applications were bogus and he looked at documents which he thought were legitimate.

He knew, at some point, from JOHN DUENAS, that ITIN cards were no longer being issued. He would have known document 1 was bogus if he received it after ITIN letters were being issued, instead of ITIN cards. He would not accept a bogus ITIN.

He did not copy any ITINs for the Guam driver's license file.

Guam Revenue and Taxation began issuing ITIN declination letters. These letters, along with the Social Security card number declination letters could be utilized together, along with other appropriate documents, to take the Guam Driver's written exam and obtain a driver's license.

PANGELINAN was presented document 1 and he advised that he was about ninety percent sure he never accepted a similar document at DMV. He never asked INA to bring in original ITINs to DMV. If he did accept document 1 it was inadvertent.

When he saw INA at DMV he would say to INA, "it's you again." He said this because INA came into DMV so often.



His supervisor was JESS SALAS and when he reviewed the applications during the interview, he saw that some of the applications had SALAS writing on them.

414



194A-HN-18383

Continuation of FD-302 of ___Joseph Cruz Pangelinan___ , On 1/25/2008 , Page 4

He was Examiner number twenty-nine (29) in the computer system.

During the interview, PANGELINAN was provided with Applications for Guam Driver's License. PANGELINAN identified his writing on the application by highlighting his writing on the application with a green highlighter. PANGELINAN highlighted his writing on the following applications:

1. Tae Sung Choi
2. Sang Mee Chung
3. Yeong Beong Gim
4. Yu Suk Kang
5. Ang Mi Choi
6. Ok Sun Kim





# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/14/2008

Francisco SN KAWAMOTO, date of birth August 25, 1943, Guam driver's license number 1228071922, mailing address Post Office Box 26027, Barrigada, Guam 96921 was interviewed at the UNITED STATES DISTRICT COURTHOUSE, DISTRICT OF GUAM, Hagatna, Guam by FEDERAL BUREAU OF INVESTIGATION Special Agent William C. Kline, Jr. and UNITED STATES POSTAL INSPECTION SERVICE, Postal Inspector Steve Basak. After being advised of the identity of the interviewing agents, purpose of the interview and that KAWAMOTO was free to leave at any time, KAWAMOTO provided the following information:

KAWAMOTO has been employed by REVENUE AND TAXATION, MOTOR VEHICLE DIVISION as a driver's license examiner for the past ten years. With regards to INDIVIDUAL TAXPAYER IDENTIFICATION NUMBER documents, MVD policy is to only accept original documents or those copies certified by the issuing agency. An original ITIN document is either the ITIN card or a letter with the card attached. Examiners, by policy, are never allowed to accept photocopied ITIN documents.

ITIN documents contain green ink. Most people bring show the card as applicants very seldom bring the letter. KAWAMOTO has also learned that the paper the INTERNAL REVENUE SERVICE uses for their original documents is sometimes thicker than photocopier paper.

KAWAMOTO has never accepted photocopied documents and has never been asked by co-workers to accept photocopied documents. If he had, KAWAMOTO would have rejected them. KAWAMOTO has been presented with, and denied, photocopied driver's licenses and passports.

When an applicant submits their driver's license application, the ITIN information will be completed on the application. KAWAMOTO verifies this information against the ITIN document and notes that he verified the ITIN by writing a notation on the application.

KAWAMOTO later added that this policy to only accept originals was instituted during the change in the graduated driver's licenses, probably in 2004. Prior to that policy being

| | | |
|---|---|---|
| Investigation on | 01/09/2008 | at Hagatna, Guam |
| File # | 194A-HN-18383 | |
| | Date dictated | not dictated |

00293

SA William C. Kline, Jr.:wck

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency



GOVERNMENT EXHIBIT
25

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___Francisco SN KAWAMOTO___, On _01/09/2008_, Page _2_

instituted, KAWAMOTO didn't ask if a document was original and probably accepted photocopied ITIN documents.

KAWAMOTO knows a Korean female, Ina LEE, who escorts Korean applicants to MVD and assists them in obtaining their driver's licenses. He would see her once every two months or so. KAWAMOTO does not remember LEE ever presenting him with photocopied ITIN documents. He and LEE are not friends and LEE never gave or offered him gifts or money to accept photocopied or fraudulent ITIN documents.

FD-302 (Rev. 10-6-95)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/17/2008

Francisco SN KAWAMOTO, date of birth August 25, 1943, Guam driver's license number 1228071922, mailing address Post Office Box 26027, Barrigada, Guam 96921 was interviewed at the UNITED STATES DISTRICT COURTHOUSE, DISTRICT OF GUAM, Hagatna, Guam by FEDERAL BUREAU OF INVESTIGATION Special Agent William C. Kline, Jr. and UNITED STATES POSTAL INSPECTION SERVICE, Postal Inspector Steve Basak. After being advised of the identity of the interviewing agents, purpose of the interview and that KAWAMOTO was free to leave at any time, KAWAMOTO provided the following information:

KAWAMOTO was shown photocopies of Guam Driver's license applications and asked to mark all of her handwriting, if any, that appeared on the following applications: 

KANG, Dongmi          8/2/05
KANG, Sung Hun
CHAE, Jung Il
LEE, Naeng Hwa
KIM, Sang Ho
KIM, Mi Jung

KAWAMOTO marked his handwriting on each application with pen. In his hand, KAWAMOTO wrote, signed and dated the following statement:

I review 6 DL applications and the (illegible) is my own handwring.

The interview is memorialized on a separate FD-302. The above-referenced applications are being maintained as evidence.

Investigation on    01/09/2008    at   Hagatna, Guam

File #  194A-HN-18383                        Date dictated    not dictated

by    SA William C. Kline, Jr.:wck

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GOVERNMENT
EXHIBIT
26

FD-302 (Rev. 10-6-95)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/10/2005

On 11/08/2005, Special Agent (SA) FERGUSON conducted the following investigative activities:

SA FERGUSON placed a call to GUAM MOTOR VEHICLE DIVISION. SA FERGUSON did not identify himself as a Special Agent of the FBI. The phone call was answered by an individual who did not identify himself/herself by name. SA FERGUSON inquired as to how a Korean with a Korean driver's license could obtain a Guam driver's license. The individual replied that the following were necessary:

1. A Social Security Account Number (SSAN) or Individual Taxpayer Identification (ITIN) or letter from both the SOCIAL SECURITY ADMINISTRATION and the DEPARTMENT OF REVENUE AND TAXATION stating that the person can not get a SSAN;

2. A passport;

3. A Korean driver's license with a translation attached thereto;

4. A passing score on the written driver's exam;

5. A passing score on the road test. However, the road test is not necessary if the Korean driver's license has been issued for five years or more;

6. An eye test.

SA FERGUSON also asked the individual about the requirements for re-issuance of an expired Guam driver's licence. The individual replied that if the license has been expired for a period of more than two years, one has to take both the written and the road test.

Later on 11/08/2005, SA FERGUSON placed another call to GMVD. SA FERGUSON again did not identify himself as a Special Agent of the FBI. This time the individual who answered identified himself as JOHN DUENAS (PH). DUENAS advised that all documents submitted for a Guam driver's license must be original.

Investigation on    11/08/2005    at  Momgmong, Guam

e # 194B-HN-18383                                    Date dictated

by    SA J. Alexander Ferguson:jaf

GOVERNMENT
EXHIBIT

27

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On _11/08/2005_ , Page _2_

In particular, DUENAS advised that if an individual was no longer in possession of their original Social Security document, then they would have to go to the SOCIAL SECURITY ADMINISTRATION office and obtain a stamped certified letter bearing the number.

FD-302 (Rev. 10-6-95)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/14/2008

John WC DUENAS, date of birth November 03, 1971, Guam driver's license number 1228010853, residing at 185 South San Miguel Street, Talofofo, Guam 96915, was interviewed at the UNITED STATES DISTRICT COURTHOUSE, DISTRICT OF GUAM, Hagatna, Guam by FEDERAL BUREAU OF INVESTIGATION Special Agent William C. Kline, Jr. and UNITED STATES POSTAL INSPECTION SERVICE, Postal Inspector Steve Basak. After being advised of the identity of the interviewing agents, purpose of the interview and that DUENAS was free to leave at any time, DUENAS provided the following information:

DUENAS has been a REVENUE AND TAXATION, MOTOR VEHICLE DIVISION (MVD) driver's licensing examiner for the past thirteen years.

MVD's policy for the acceptance of driver's license application supporting documents is examiners are only permitted to accept originals documents. This policy includes documents supporting SOCIAL SECURITY ACCOUNT NUMBERS (SSAN) and INDIVIDUAL TAXPAYER IDENTIFICATION NUMBERS (ITIN). This policy has been in effect since DUENAS started and DUENAS has been informed about the policy both in writing and also by his supervisor and co-workers.

An original SSAN card has a number in color on the back. An ITIN comes attached to a letter with perforation so that the card can be detached. Both documents are on paper that is thicker than photocopier paper. DUENAS has never seen a photocopied ITIN document and added that the original ITIN document has some of the print in green ink. DUENAS has never taken or been offered money to accept photocopied documents.

DUENAS is aware of a Korean female, Ina LEE (LEE), also known as Ina CHO, that brought several Korean driver's license applicants into MVD to help them through the process. DUENAS first met LEE in the early 1990's when the two were teammates on a local bowling team. DUENAS added LEE is also employed by CONTINENTAL AIRLINES. DUENAS estimated LEE would accompany an applicant into the MVD twice a month, helping a total of twenty people. LEE told the examiners the people she assisted were family members or friends of hers. Older employees warned DUENAS about LEE as some were suspicious that she had so many family members. DUENAS was

---

Investigation on    01/09/2008    at Hagatna, Guam    00 302

File #  194A-HN-18383                          Date dictated    not dictated

by   SA William C. Kline, Jr.:wck

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GOVERNMENT
EXHIBIT



194A-HN-18383

Continuation of FD-302 of ___John WC DUENAS_____ , On _01/09/2008_ , Page __2__

unclear as to what those suspicions meant other than LEE may not be
being truthful, for whatever reason.

    LEE has never given DUENAS anything of value.  DUENAS is
unsure if LEE ever brought in food for himself or any of the
examiners.

    DUENAS has been presented with, and denied, photocopied
passports, SSAN cards and name change documents.  Most people say
they have lost the original and are left with only a copy.

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription   01/17/2008

John WC DUENAS, date of birth November 3, 1971, Guam driver's license number 1228010853, residing at 185 South San Miguel Street, Talofofo, Guam 96915, was interviewed at the UNITED STATES DISTRICT COURTHOUSE, DISTRICT OF GUAM, Hagatna, Guam by FEDERAL BUREAU OF INVESTIGATION Special Agent William C. Kline, Jr. and UNITED STATES POSTAL INSPECTION SERVICE, Postal Inspector Steve Basak.  After being advised of the identity of the interviewing agents, purpose of the interview and that DUENAS was free to leave at any time, DUENAS provided the following information:

DUENAS was shown photocopies of Guam Driver's license applications and asked to mark all of her handwriting, if any, that appeared on the following applications:

LEE, Miyoung
RYU, Sang Chul
KIM, You Soon   #6
KIM, Ha Young
PARK, Sang Jin
HAM, Jeong Min

DUENAS marked his handwriting on each application with pen.

The interview is memorialized on a separate FD-302.  The above-referenced applications are being maintained as evidence.

Investigation on   01/09/2008   at  Hagatna, Guam

File #  194A-HN-18383                                    Date dictated   not dictated

by   SA William C. Kline, Jr.:wck

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to it and its contents are not to be distributed outside your agency.

GOVERNMENT EXHIBIT
29

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/30/2007

Margaret B. UNTALAN (UNTALAN), date of birth October 24, 1949, residing at 277 East Santa Barbara, Dededo, Guam, residential telephone number 671-637-6319, cellular telephone number 671-727-9548, was interviewed at her place of employment, GUAM DEPARTMENT OF REVENUE AND TAXATION, MOTOR VEHICLE DIVISION (MVD), Barrigada, Guam. After being advised of the identity of the interviewing agent and the purpose of the interview, UNTALAN provided the following information:

UNTALAN has been a driver's licensing examiner for the past seven years. Prior to working for MVD, UNTALAN was employed by a local bank. UNTALAN'S supervisor is JESSE SALAS. SALAS replaced DEE MESA as supervisor when MESA retired several years ago. All the examiners rotate different job responsibilities which include road testing and processing driver's license applications.

The policy regarding Korean driver's license (DL) applicants depends on several factors such as the applicant's reason for living on Guam and whether or not they were issued a prior DL. If a Korean applicant holds a valid DL issued in the United States of America (USA), they can bring it to MVD and have it switched out for a valid Guam DL. If the applicant has held a valid Korean DL for five years, they need to provide a translated copy of that DL to MVD as well as a valid passport and an original social security account card or Individual Taxpayer Identification Number (ITIN) document. If the applicant does not meet the above criteria, they are required to complete thirty two hours of driver's education before testing for their DL. If the applicant is a student on Guam, they can apply for a one year provisional DL by providing, among other things, a declination letter from both the Social Security Administration and the IRS. The letters are to show that applicant applied for and was denied a Social Security Account Number (SSAN) and an ITIN.

MVD moved to their current location a couple of years ago. At the former location, MVD examiners would verify applicant's documentation and, in most cases, input the applicant's information into the MVD computer system. Due to only one window being dedicated to accepting DL applications, a high number of applicants did force, on occasion, an examiner to set aside the applications to be entered in the system at a later time so that

---

Investigation on   11/28/2007   at   Barrigada, Guam

       00359

File #   194A-HN-18383           Date dictated   not dictated

by   SA William C. Kline, Jr.:wck

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GOVERNMENT EXHIBIT
30



194A-HN-18383

Continuation of FD-302 of ___Margaret B. UNTALAN_____ , On 11/28/2007 . Page  2

the line did not back up.  Although possible that an examiner could
input information verified by another examiner, for the most part,
examiners inputted their own verified applications.  Since moving
to the current MVD location, UNTALAN said examiners now are able to
process all of the applications while the applicant is present.

     With regard to ITINs and SSANs, MVD requires that both
are displayed on their original documents.  For a SSAN, the
original card is required.  For ITINs, the applicant must produce
the original document containing the ITIN number.  MVD examiners
are not able to accept photocopied documents.  UNTALAN has never
accepted a photocopied document and does not know of any examiner
that has.  UNTALAN was instructed by several examiners regarding
the original document policy during on the job training.  UNTALAN
believes the application spells out that the SSAN and ITIN
must be on original documents from the issuing agency.  UNTALAN has
never been asked or directed to accept documents that weren't
original and wouldn't even if she had.  UNTALAN doesn't recall
SALAS ever telling her about the original document requirement.

     UNTALAN knows of a Korean woman, Ina Last Name Unknown
(LNU) that assists Korean applicants with getting Guam DLs.
UNTALAN was told by another examiner that Ina LNU works for
CONTINENTAL AIRLINES.  UNTALAN also saw Ina LNU in a Continental
uniform at the GUAM INTERNATIONAL AIRPORT.  UNTALAN is not sure but
thought Ina LNU was working in an information booth at the time she
saw her at the airport.

     Ina LNU would come to the previous MVD location a lot,
most of the time with Korean DL applicants.  UNTALAN does not know
the relationship between Ina LNU and the applicants but just
assumed she was translating for her family members.  UNTALAN does
not know of any occasion where Ina LNU provided anything to the
examiners or offered to buy or bring them anything.  All of the
examiners knew Ina LNU but no one seemed to have a friendship with
her and she didn't seem to favor any one examiner over another and
would bring the applicants she escorted to the first available
examiner.  UNTALAN believes she may have processed ten or fewer
applications in which Ina LNU assisted a Korean applicant.

     UNTALAN last saw Ina LNU approximately two months ago.
Ina LNU was assisting a Korean applicant with his road test
administered by UNTALAN.  UNTALAN failed the applicant because he
was unable to follow directions in English.  Ina LNU didn't seem
angry that the individual failed and was instructed by UNTALAN as



Case 1:08-cr-00004    Document 111-2    Filed 05/06/2008    Page 80 of 89



194A-HN-18383

Continuation of FD-302 of ___Margaret B. UNTALAN_____ , On _11/28/2007___ , Page ___3___

to why he failed. UNTALAN does not believe Korean speakers should be accommodated for their lack of English comprehension with regards to obtaining a DL as it is a public safety issue.

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription _01/12/2008_

    Margaret B. UNTALAN, date of birth October 24, 1949, residing at 277 East Santa Barbara Avenue, Dededo, Guam, was interviewed at the UNITED STATES DISTRICT COURTHOUSE, DISTRICT OF GUAM, Hagatna, Guam by FEDERAL BUREAU OF INVESTIGATION Special Agent William C. Kline, Jr. and UNITED STATES POSTAL INSPECTION SERVICE, Postal Inspector Steve Basak. After being advised of the identity of the interviewing agents, purpose of the interview and that UNTALAN was free to leave at any time, UNTALAN provided the following information:

    UNTALAN has been employed by the REVENUE AND TAXATION, MOTOR VEHICLE DIVISION (MVD) since 2002. With regards to the acceptance of SOCIAL SECURITY ADMINISTRATION documents or documents related to an INDIVIDUAL TAXPAYER IDENTIFICATION NUMBER, examiners are only to accept originals of each and that has been the policy the entire time UNTALAN has been employed by MVD.

    When asked to describe how she determines whether or not a document is original, UNTALAN advised she compares the name and number on the document to the name and number on the application to make sure they match. UNTALAN also said it is possible that a photocopied SSA or ITIN document is lighter and that sometimes original documents are thinner than originals. UNTALAN said originals also bear an original signature. She did not know whether original ITIN documents had green ink anywhere on the document.

    After UNTALAN has determined the ITIN document she reviewed is original, she writes the ITIN on the application to show that she has verified the ITIN document.

    UNTALAN would later say that she is not properly trained to determine whether or not a document is fraudulent or original. UNTALAN was unsure whether or not she made a conscious attempt to determine whether or not a document was original apart from matching the name and number on the document to the name and number presented on the application. UNTALAN added that ninety-nine percent of ITIN documents are brought into MVD in their original envelopes in which they were mailed from the INTERNAL REVENUE SERVICE. UNTALAN advised she assumes the document is original

---

| Investigation on | 01/09/2008 | at | Hagatna, Guam |

File # 194A-HN-18383

Date dictated _not dictated_

SA William C. Kline, Jr.:wck

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GOVERNMENT
EXHIBIT
31



194A-HN-18383

Continuation of FD-302 of ___Margaret B. UNTALAN_____ , On _01/09/2008_ , Page ___2__

because the applicant will pull the document, folded, from the envelope. UNTALAN has asked co-workers for help if questions arise but has never sought additional training from co-workers or supervisors with regards to differentiating original documents from fraudulent documents.

To UNTALAN's knowledge, she has never been presented a photocopied ITIN document. When asked how she could differentiate between a photocopied ITIN document and an original if she's never seen a photocopied ITIN, UNTALAN said she has been presented with photocopied passport pages and social security cards and assumes the same characteristics apply.

UNTALAN has seen a Korean female that helps Korean applicants submit their driver's license applications. UNTALAN knows the female as INA and said she used to make frequent visits to the MVD. The two women are not friends and UNTALAN finds INA to be loud. INA seemed to know a few of the former or current examiners such as Mary GARCIA, Ben PABLO and Clark FIELD.

In all cases in which someone has presented UNTALAN a photocopied document, she has always declined to accept that copy. UNTALAN has never been asked by co-workers or supervisors to accept a photocopied document that was against MVD policy. UNTALAN never been offered money to accept photocopied documents.

FD-302 (Rev. 10-6-95)

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/17/2008

     Margaret B. UNTALAN, date of birth October 24, 1949, residing at 277 East Santa Barbara Avenue, Dededo, Guam, was interviewed at the UNITED STATES DISTRICT COURTHOUSE, DISTRICT OF GUAM, Hagatna, Guam by FEDERAL BUREAU OF INVESTIGATION Special agent WILLIAM C. Kline, Jr. and UNITED STATES POSTAL INSPECTION SERVICE, Postal Inspector Steve Basak.  After being advised of the identity of the interviewing agents, purpose of the interview and that UNTALAN was free to leave at any time, UNTALAN provided the following information:

     UNTALAN was shown photocopies of Guam Driver's license applications and asked to mark all of her handwriting, if any, that appeared on the following applications:

HAN, Sung Jun
JUNG, Dong Sik
LEE, Min Chul
LEE, Ji Eon
KIM, Young Nam
OH, Jung Ja

     UNTALAN marked her handwriting on each application with yellow highlighter.

     The interview is memorialized on a separate FD-302.  The above-referenced applications are being maintained as evidence.

---

| | | | | |
|---|---|---|---|---|
| Investigation on | 01/09/2008 | at | Hagatna, Guam | |
| File # | 194A-HN-18383 | | Date dictated | not dictated |
| by | SA William C. Kline, Jr.:wck | | | |

GOVERNMENT
EXHIBIT
32

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____09/25/2007_____

Mary C. Garcia, aka Mary J. Garcia, date of birth September 23, 1954, Social Security Account Number 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, California Driver License Number N0658454, home address 13090 Wimberly Square, Apartment 55, San Diego, California 92128, home telephone (858) 668-3307, cellular telephone (619) 925-0700, was interviewed at the San Diego Field Office of the Federal Bureau of Investigation. After being advised of the identities of the interviewing agents, and the nature and purpose of the interview, Garcia volunteered the following:

Garcia lived in Guam for about 15 years before moving to San Diego in November 2006. While in Guam, Garcia worked as a Driver License Examiner for the Motor Vehicle Department (MVD) for 11 years. As an Examiner, Garcia processed applications, and proctored the written and road exams. Garcia occasionally filled in for her supervisor, and assisted the Guam Police Department (GPD) and Immigration with obtaining driver license photographs.

Garcia explained that she processed driver license applications for U.S. citizens and foreign nationals. When applying for a Guam driver license, a U.S. citizen filled out an application and presented the following documents to an Examiner for review:

- A current driver license from another state;

- An original Social Security Card; and

- A second form of valid identification, which included a passport, a military ID, or another form of state ID.

When applying for a Guam driver license, a foreign national filled out an application and presented the following documents to an Examiner for review:

- An original, valid visa or passport;

- A current driver license from another country; and

- An original Social Security Card or Individual Taxpayer Identification Number (ITIN).

---

Investigation on _____09/24/2007_____ at _San Diego, California_

# 194A-HN-18383 ° 559                                                    00362

SA John R. Ireland / jri
by SA Jeremy Crider                    Date dictated ___Not dictated___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to it and its contents are not to be distributed outside your agency.

GOVERNMENT
EXHIBIT



194A-HN-18383

Continuation of FD-302 of ___Mary C. Garcia_____ , On _09/24/2007_ , Page __2__

Both sets of applicants then paid the application fee and took a written exam. The application fee was $5 but recently changed to $25. If the applicant did not have a current, valid driver license at the time of application, the applicant had to attend a drivers education course.

Previously unlicensed drivers also had to take a road test, which involved driving with an Examiner in the car. Some foreign national applicants were also required to take the road test based on where they acquired their driver license and how long they had been driving.

The written test given to foreign national applicants was the same exam given U.S. citizens. The test was available in Japanese, Korean, Tagalog, and Chinese. Foreign national applicants were not required to speak English to receive a Guam driver license but had to pass the tests. Japanese and Korean applicants also had to provide certified translations of their current driver licenses from their consulates.

If a foreign national applicant did not possess a valid Social Security Card, the applicant was referred to the Social Security Administration. If the foreign national applicant did not qualify for a Social Security Card, the applicant was referred to the Tax and Revenue Department for an ITIN number.

Garcia stated that the MVD's operating procedures were very clear with regard to documents provided by applicants. Only original documents were accepted. Even when an applicant presented a certification from another state's Department of Motor Vehicles in lieu of a lost driver license, that certification had to be an original. Fax copies were not accepted. Garcia did not receive training on how to identify original documents but was able to identify fakes. Additionally, the MVD possessed a book that showed Examiners what driver licenses from other states and other forms of identification looked like. The book was updated regularly.

The MVD did not employ any translators or contractors who provided translation services. Foreign national applicants often brought in friends or family members to assist them if they did not speak English well enough.

Garcia recognized the name Ina Lee and advised that she always helped out Lee. Lee was employed by Continental Airlines as a flight attendant. Lee was never employed by the MVD and did not





194A-HN-18383

Continuation of FD-302 of ___Mary C. Garcia_____ , On _09/24/2007_ , Page __3__

work as any sort of official translator for foreign national applicants. Garcia described Lee as a Korean female in her early 40s, with short dark hair. Lee was slender but had lost a lot of weight, and was about 5 foot 6 inches in height.

Lee often brought Korean friends and family to the MVD and translated for them when necessary. Garcia recalled that Lee was very nice and occasionally offered to get her something from her trips to Korea. Garcia once gave Lee approximately $15 to buy a Gucci-style purse in Korea.

Lee came into the MVD over the last two or three years that Garcia worked. Toward the end of that time, Lee came in more frequently. Garcia approximated that Lee would come in two or three times a week and then not come in for a week or so.

According to Garcia, Lee "helped a lot of people." Garcia recalled processing between five and ten of the applicants that Lee assisted. If Garcia was busy, Lee went to Examiners John Duenas (aka "JD"), Frank Kawamoto or Margaret Untalan.

Garcia described her supervisor, Jesse Salas, as being very strict about the regulations. When an applicant initially came in to apply for a license, Garcia and the other Examiners were required to meet the applicant face-to-face and verify their documents. Salas sometimes stood behind Examiners and watched them do their jobs. Salas often warned the Examiners to closely check all documents because "you don't know these people." Garcia occasionally allowed Lee to reschedule an appointment to take the written exam for an applicant that failed the written test without the applicant being there; otherwise, Garcia met the applicant face-to-face.

Garcia could not recall whether applicants who failed one of the exams were required to provide their documents again when they re-applied. Garcia believed that original documents were not needed for a re-application because the documents were already "in the system." Garcia noted that many applicants brought in their original documents every time so it was not an issue. Garcia then recalled that her supervisor required original documents every time.

The written exams used to be administered by the Examiners at the MVD; however, starting around 2004 or 2005, the exams were administered at the University of Guam. The change was





194A-HN-18383

Continuation of FD-302 of ___Mary C. Garcia_____ , On __09/24/2007__ , Page __4__

made because the MVD moved to a new building and because Examiners just did not have the time. Mary Calvo, an employee of the University of Guam, administered the exams once every other week in the university's field house. Garcia described Calvo as a short, heavy set, Chamorro woman, in her late 40s.

The MVD occasionally administered the written exam at its office but only in hardship cases. Garcia explained that occasionally an applicant needed to get a chauffeur's license quickly or a GPD officer needed a motorcycle license. The chauffeur's license and motorcycle exams were only available in English. Garcia did not recall any of Lee's family or friends taking a hardship exam.

Garcia recalled that a number of foreign national applicants, including a lot of Lee's family and friends, who took the non-English written tests were suddenly able to pass the chauffeur's test, which was given only in English. Garcia and other employees believed that someone proctoring the written test at the University of Guam was being paid off. Garcia never heard of anyone accepting a bribe but believed it was the only way for non-English speaking applicants to pass those exams.

(At this point in the interview, Garcia was advised that lying to federal agents is a crime and that it was better to remain silent rather than telling a lie. Garcia indicated that she understood.)

Garcia was asked whether any of her coworkers or supervisors directed her to give preferential treatment to an applicant or to ignore MVD policies. Garcia stated that she was never directed to give preferential treatment. Further, she advised that she always went by the book and would not pass an applicant who was not ready.

Garcia was asked whether she ever accepted or was directed to accept fraudulent or forged documents. Garcia stated that she has never purposefully accepted fraudulent or forged documents. Garcia recalled that occasionally she accepted photocopies of marriage certificates or divorce decrees for an applicant. In those cases, the applicant already provided the original to the Social Security Administration for a name change.



Garcia occasionally assisted Salas' boss, Frank Blaz, to process an application for someone who had a problem with their



194A-HN-18383

Continuation of FD-302 of ___Mary C. Garcia_____ , On _09/24/2007_ , Page __5__

documentation, such as a lost license. In each case, Blaz personally knew the applicant. Garcia also had Blaz sign off on the application. Blaz never made a request on behalf of a Korean national and did not know Lee.

Garcia was asked whether Lee ever provided gifts, food, money, or anything of value to her or other MVD employees. Garcia stated that she has never heard of or seen anyone receiving any of those things from Lee. Garcia reminded the interviewing agents that she received a Gucci-style purse from Lee but gave Lee the $15 to buy the purse in Korea.

Garcia was asked whether applicants have ever been allowed to use fake physical addresses. Garcia advised that applicants have probably used fake physical addresses on their applications; however, Examiners had no way of verifying physical addresses and did not try to do so during the application process.

Garcia is not aware of any illegal activity at the MVD. She has never accepted money or gifts from Lee or anyone else. Garcia has been offered bribes by applicants who wanted to pass the road test. In each case, Garcia turned down the bribe and flagged the applicant in the computer. Garcia felt a little leery with Lee on a couple of occasions when Lee became insistent that a friend or family member needed to pass a driving test.

Garcia advised that her middle initial used to be "C" but she is now using the middle initial "J" after her divorce.

